Douglas C. Moore & others *vs.* School Committee of Newton & another.

Middlesex. May 4, 1978. — June 19, 1978.

Present: Hennessey, C.J., Quirico, Braucher, Liacos, & Abrams, JJ.

*School and School Committee. Municipal Corporations,* Referendum.

Votes of a school committee to close two elementary schools were legislative acts and thus subject to the referendum provisions of the city's charter. [446-447]

A school committee's votes to close two elementary schools constituted "final passage . . . of the measure" within the meaning of the city's

charter and thus were subject to the charter's referendum provisions even though the school committee had not yet voted on the final budget incorporating the deletions for the closings. [447-448]

A school committee's votes to close two elementary schools were not exempt from challenge by referendum under the city's charter exempting the school committee budget from such a challenge. [448-449]

A school committee's authority to manage the school system under G. L. c. 71, did not preclude a referendum to rescind its votes to close two elementary schools. [449-450]

CIVIL ACTION commenced in the Superior Court on March 27, 1978.

The case was reported to the Appeals Court by *Doerfer*, J. The Supreme Judicial Court granted a request for direct review.

*Jason A. Rosenberg* for the plaintiffs.

*Kristen Reasoner Apgar*, Assistant City Solicitor, for the defendants.

LIACOS, J.   This case was commenced in the Superior Court by a complaint for injunctive relief and declaratory judgment filed by residents and taxpayers of Newton. The named defendants are the school committee of Newton and the city of Newton.[1] At the request of the parties, a judge of the Superior Court reserved and reported the matter without decision to the Appeals Court. G. L. c. 231, § 111. Mass. R. Civ. P. 64, 365 Mass. 831 (1974). We granted a joint application for direct appellate review. There is an agreed statement of material facts.

The dispute between these parties involves the plaintiffs' efforts to overturn by referenda the school committee's votes of March 22, 1978, to close two elementary schools. The school age population in Newton has been declining for

---

[1] In the statement of agreed facts, the parties state that they "disagree as to whether the City of Newton is a proper party defendant." We note that the assistant city solicitor filed a motion to dismiss as to Newton under Mass. R. Civ. P. 12, 365 Mass. 754 (1974). The record is silent as to the disposition of this motion, and the issue is not argued in the defendants' brief. Thus, we pass the question whether Newton is a proper party defendant to this proceeding.

several years. To deal with the problem of the resulting underutilization of school facilities, the superintendent of schools prepared and submitted a feasibility study for closing schools and consolidating school districts. The school committee adopted on February 15, 1978, certain guidelines for school consolidation. On March 22, 1978, the school committee voted to close two Newton elementary schools, Hamilton and Emerson. The Hamilton School would be closed as of September, 1978, and the Emerson School, as of September, 1979.

On March 27, 1978, the plaintiffs filed with the city clerk a referendum petition, signed by the necessary number of registered voters, protesting the vote to close the Hamilton School. That same day, the plaintiffs filed a complaint in the Superior Court to prevent the school committee from deleting funds from budgetary accounts for the Hamilton School. In lieu of an injunction, the parties agreed to a stipulation that obligated the school committee to request a supplemental appropriation to fund the Hamilton School for the fiscal year 1979 budget, provided that (1) the highest Massachusetts court determine that the school committee's vote of March 22, 1978, to close the Hamilton School was susceptible to referendum, and (2) the electorate approve the referendum. That evening the school committee voted to delete from its fiscal 1979 budget the funds for the operation of the Hamilton School.

The following day, the plaintiffs presented a referendum petition to rescind the March 22 vote which would close the Emerson School. The Newton election commission then duly certified the signatures on the petitions which protested the closing of the two schools. Thereafter the petitions were submitted to the school committee. The school committee decided that it could take no action on the petitions until it was determined whether the March 22 votes were proper subjects for referendum under the Newton charter.[2]

_____

[2] Pursuant to art. 10, § 10-11, of the Newton charter, within thirty days after a referendum petition is presented to the school committee it must either reconsider and repeal the measure which is the subject of the refer-

Subsequently, the plaintiffs brought a supplemental complaint, which narrowed their case to a declaratory action for a determination of their right to rescind by referenda the March 22 votes to close the Hamilton and Emerson Schools.

Because this case required a speedy resolution of the dispute, on May 17, 1978, we issued an order in which it was held that the school committee's votes of March 22 are susceptible to the referendum provisions of the Newton charter. Our reasons for that holding are set forth below.

1. Although Newton did not adopt one of the charter plans set out in G. L. c. 43, the referendum provisions in art. 10 of the Newton charter, approved by the voters in 1971, are similar to the referendum powers granted voters in G. L. c. 43, §§ 37-43. Article 10, § 10-9, of the Newton charter reads in part: "Except as otherwise provided by law or the charter, any measure passed by the Board of Aldermen or the School Committee . . . may be protested and referred to the voters . . . ." Article 10, § 10-10, provides that "[r]eferendum procedures shall be started by the filing of a referendum petition with the City Clerk within twenty days after the final passage . . . of the measure to which the petition relates." "Measure" is defined by art. 11, § 11-13g, to mean "an order, resolution, vote, or other proceeding passed or which could be passed by . . . the School Committee."

If we were to literally construe this referendum provision, no distinction between legislative and executive acts would be drawn. See, e.g., *McKinley* v. *Fraser*, 366 Mich. 104 (1962). Most courts, however, restrict the right of initiative and referendum petition to legislative acts. 5 E. McQuillan, Municipal Corporations § 16.55 (3d rev. ed. 1969). We have noted often the possible distinction between legislative and executive acts, without deciding whether the referendum provision in G. L. c. 43, contained such an implied limita-

endum petition or notify the board of aldermen that it has failed to take such action on the measure. The board must then provide for referral of the matter to the voters.

tion. See *Fantini* v. *School Comm. of Cambridge*, 362 Mass. 320, 323 (1972), and cases cited. The defendants contend that the votes of March 22, 1978, to close the two schools are executive acts and that the legislative/executive distinction should be applied here to exclude those votes from the referendum process. They argue that, while the school committee's vote in February to adopt a set of Guidelines for Elementary School Consolidation was a legislative act, the subsequent votes to close were merely the execution of the policies set forth in the guidelines. We believe, however, that the votes to close are more accurately characterized as a legislative act. Thus, it is a measure subject to referendum even under the more restrictive construction of the referendum provisions.

The crucial test as to whether an act is legislative or executive is "whether the proposition is one to make new law or to execute law already in existence." 5 E. McQuillan, *supra* at 213. In labeling an act as legislative, we have considered whether a "sweeping determination of municipal policy" was made. See *Gorman* v. *Peabody*, 312 Mass. 560, 564-565 (1942) (school committee vote to increase salary of all school teachers was legislative measure); *Fortin* v. *Chicopee*, 301 Mass. 447, 448 (1938) (salary reduction for a single officer was executive in nature).

The line between executive and legislative actions is sometimes difficult to delineate and in some instances may be completely obliterated. See *Selectmen of Milton* v. *District Court of E. Norfolk*, 286 Mass. 1, 5 (1934). Such is not the case here. The votes to close the Hamilton and Emerson schools involved a policy determination common to legislative action. Before voting to close and consolidate, the school committee weighed the social costs of the closing on the pupils and community against the economic savings and other gains to be realized. The prior approval of the guidelines was merely a statement to the public of the factors which the school committee considered relevant when voting to close a school, and thus did not constitute final leg-

islative action. Cf. *Dooling* v. *City Council of Fitchburg*, 242 Mass. 599, 602 (1922).

Relying on *Fantini* v. *School Comm. of Cambridge*, *supra*, the defendants further contend that the challenged March 22 votes do not represent "final passage . . . of the measure" (art. 10, § 10-10), and hence are not amenable to referendum under the Newton charter. In *Fantini*, we held that the votes of the Cambridge school committee not to reappoint the superintendent and to so notify him were not "final" and thus could not be rescinded by referendum. We found in that case that the "essence of the vote was negative; the superintendent's appointment was not to be terminated by action of the school committee but was to expire with the school year in the absence of action to reappoint him." *Id.* at 324. See *Opinion of the Justices*, 370 Mass. 879, 881 (1976). In contrast, the school committee here affirmatively voted to close two schools which would otherwise be open. The school committee's implementation of the decision to close the schools by making budget cuts and taking other steps to consolidate the school districts further demonstrates the finality of the vote. The defendants contend, however, that only the passage of the final budget incorporating the deletions for closings would be final, the vote to close the schools being preliminary and capable of rescission until then. This argument is unpersuasive. The school committee's ability to reconsider and rescind the March 22 votes does not lessen their finality.

The defendants next assert that the March 22 votes may not be protested by referenda since they fall within art. 10, § 10-12 (3), which exempts the school committee budget from challenge by referendum. According to the defendants, the plaintiffs may not avoid this prohibition by challenging the votes leading up to passage of the budget rather than protesting the budget itself. We have already found, however, that the votes to close the schools were both final and legislative, and thus measures which may be protested by referenda. We do not interpret the budget exemption as prohibiting by implication a protest of a vote to

close a school. Such a broad interpretation would consume the right to a referendum in view of the fact that most measures have some budgetary effect. Cf. *Murray* v. *Secretary of the Commonwealth*, 345 Mass. 23, 28 (1962) (statute increasing salaries of Legislature held not to be excluded appropriations measure since measure itself did not actually set money aside). Nor would subjecting these March 22 votes to referenda "destroy the efficacy of other governmental mandates." See *Gilet* v. *City Clerk of Lowell*, 306 Mass. 170, 175 (1940) (lump sum reduction in budget without specific reference to any items was improper subject for referendum).

2. We also reject the defendants' argument that the school committee's authority to manage the school system under G. L. c. 71, precludes a referendum to rescind its votes to close the two schools. It has long been recognized that "the school committees in this Commonwealth have had 'substantially final authority' to determine the needs of the school systems." *Bell* v. *North Reading*, 363 Mass. 505, 510 (1973), quoting from *Casey* v. *Everett*, 330 Mass. 220, 222 (1953). See *Norton Teachers Ass'n* v. *Norton*, 361 Mass. 150, 154 (1972); *Hayes* v. *Brockton*, 313 Mass. 641, 644 (1943). We have, however, recognized limitations on the traditional school committee autonomy where there was either an express or implicit statutory limitation on the powers of a school committee. These express or implied limitations generally relate to efficiency in handling the financial affairs of a city. See *Urban Transp., Inc.* v. *Mayor of Boston*, 373 Mass. 693, 699 (1977); *School Comm. of Boston* v. *Finance Comm'n of Boston*, 364 Mass. 187, 190-191 (1973); *School Comm. of Gloucester* v. *Gloucester*, 324 Mass. 209, 218 (1949). We have also recognized that certain actions of the school committee are susceptible to review by referendum. In *Gorman* v. *Peabody*, 312 Mass. 560 (1942), the school committee's vote to increase teachers' salaries was held to be a proper subject for protest by referendum, although that vote involved an area traditionally viewed as the exclusive preserve of a school committee under G. L.

c. 71. Cf. *Leonard* v. *School Comm. of Springfield*, 241 Mass. 325, 329-330 (1922).

We believe that this case is controlled by *Gorman* v. *Peabody, supra. Gorman* declared that the "statutory provisions as to the powers and duties of school committees, which are of long standing, are to some extent, at least, by the charter provisions for the referendum, made subject to the orderly expression of the will of the registered voters, in so far as a 'measure' finally passed by the school committee is concerned." *Id.* at 570. Contrary to the defendants' claim, we do not believe that the right of the voters to rescind the decisions to close the Hamilton and Emerson schools would unduly interfere with the operations of the school committee. The cases which the defendants rely on to establish the supremacy of the school committee over the closing of schools do not involve the referendum process. See *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 441 (1972); *Dowd* v. *Dover*, 334 Mass. 23, 26 (1956); *Jantzen* v. *School Comm. of Chelmsford*, 332 Mass. 175, 178 (1955); *Morse* v. *Ashley*, 193 Mass. 294 (1906).

3. Because the votes to close the two schools are final measures subject to referenda under the Newton charter and are not superseded by the school committee's power under G. L. c. 71, we hold that judgment should be entered declaring the right of the plaintiffs to submit their referendum petitions involving the Hamilton and Emerson schools to the voters.

*So ordered.*