821 P.2d 146

**Marilynn L. WENNERSTROM, Plaintiff/Appellant,**

v.

**CITY OF MESA, Arizona; Barbara Hogue, Mesa City Clerk, Defendants/Appellees.**

No. CV–91–0068–AP.

Supreme Court of Arizona, En Banc.

Oct. 24, 1991.

Reconsideration Denied Dec. 17, 1991.*

---

* Feldman, V.C.J., voted to grant reconsideration.

**486**

Meyer, Hendricks, Victor, Osborn & Maledon by Bruce E. Meyerson, Mary E. Berkheiser, Ronald R. Gallegos, Phoenix, for plaintiff, appellant.

Neal J. Beets, Mesa City Atty., Mesa, for defendants, appellees.

Shelley & Bethea by J. LaMar Shelley, Mesa, for amicus curiae League of Ariz. Cities and Towns.

## OPINION

MOELLER, Justice.

### STATEMENT OF THE CASE

Marilynn Wennerstrom (plaintiff) sought to compel the City of Mesa (City) and the Mesa City Clerk (Clerk) to continue processing several referendum petitions. She appeals the trial court's denial of her request. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 19–122(C) and 19–121.03.[1]

### FACTS

On March 9, 1987, the Mesa City Council (Council) passed a resolution calling for a bond election. At that election, held on April 28, 1987, the Mesa electorate ap-

---

1. As recently noted in *Pioneer Trust v. Pima County*, 168 Ariz. 61, 64 n. 1, 811 P.2d 22, 25 n. 1 (1991), and *Western Devcor, Inc. v. Massie*, 168 Ariz. 426, 427 n. 2, 814 P.2d 767, 768 n. 2 (1991), the court of appeals might have concurrent appellate jurisdiction in this appeal involving a referendum.

proved the City's request for authorization to issue and sell $30 million of general obligation bonds for the purpose of improving the City's streets and highways.

On September 17, 1990, the Council passed a resolution "conceptually approving" the widening of a portion of Country Club Drive from five to seven lanes "with alignment as indicated by staff." Country Club Drive is a north-south roadway running through Mesa. It is also part of State Route 87.

Shortly thereafter, plaintiff applied to the Clerk for a referendum number and received number 90–02. After obtaining signatures, plaintiff delivered the 90–02 referendum petitions to the office of the Clerk, Barbara Hogue, on October 16 and 17, 1990. Under A.R.S. §§ 19–121.01 and –141, the Clerk's duty upon receipt is to count the signatures within 48 hours and issue a temporary receipt if the number of signatures equals or exceeds the constitutionally-required number. The Clerk issued a temporary receipt.

A.R.S. §§ 19–121.02(A) and –141(A) direct the Clerk, after issuing a temporary receipt, to select and forward a random sample of 5% of the signatures to the county recorder for verification. Instead, the Clerk returned the petitions to plaintiff's residence with a letter signed by her and the City Attorney stating that no "certification" of the signatures would be sought because the Council's conceptual approval of the street widening was not legislation and, therefore, not subject to referendum. Plaintiff immediately filed a complaint in the superior court seeking an order to compel the Clerk and the City to continue processing the petitions. *See* A.R.S. § 19–122(A).

A few weeks later, on November 5, 1990, the Council passed two additional resolutions concerning Country Club Drive. The first approved a project providing for "the alignment and the improvement of Country Club Drive from Broadway to a point north of McKellips Road," and "the improvement of McKellips Road from Country Club Drive west to the future intersection with the proposed Red Mountain Freeway" (the

Project). This resolution also authorized Mesa to acquire rights-of-way for these improvements. The second resolution authorized the City Manager to execute an intergovernmental agreement with the state to share the cost of the Project.

On December 4, 1990, a coalition of Mesa citizens called Stop Over Spending (S.O.S.) submitted two separate sets of referendum petitions to the Clerk's office. The first set, bearing referendum number 90–03, sought to refer the November 5, 1990, resolution that approved the Project. The second set, bearing referendum number 90–04, sought to refer the resolution that authorized the City Manager to execute an intergovernmental agreement with the state. The Clerk issued a receipt indicating that she had received the 90–03 and 90–04 referendum petitions.

On December 6, 1990, plaintiff, who was a member of S.O.S., together with other representatives of S.O.S., visited the Clerk's office, apparently to obtain a temporary receipt. Instead, they received a letter from the Clerk and the City Attorney stating that the 90–03 and 90–04 petitions would not be processed because the resolutions involved were not subject to referendum for the same reasons previously outlined in their October 18, 1990 letter to the plaintiff. Plaintiff then amended her complaint to include allegations concerning the City's inaction with respect to the 90–03 and 90–04 referendum petitions. The amended complaint thus sought an order compelling a referendum on three resolutions: (1) the conceptual approval of September 17, 1990; (2) the Project approval of November 5, 1990; and (3) the November 5, 1990, authorization for the City Manager to execute an intergovernmental agreement to share the Project's cost.

The trial court held that the three Council resolutions were not subject to referendum because they were not legislative actions. Plaintiff appealed the trial court's ruling concerning the September 17 conceptual approval resolution and the November 5 Project approval resolution, but did not appeal the trial court's ruling on the intergovernmental agreement resolution.

We set an accelerated briefing and argument schedule on this appeal and heard oral argument on April 12, 1991. On May 7, 1991, we issued an order affirming the trial court decision and stating that an opinion would follow. This is that opinion.

## QUESTION PRESENTED

Whether the Mesa City Council's resolution of September 17 (conceptual approval) or the resolution of November 5, 1990 (Project approval) were legislative acts subject to referendum.

## DISCUSSION

### I. The Scope of the Referendum Power

The Arizona Constitution reserves the powers of initiative and referendum to the people. Ariz. Const. art. 4, pt. 1, § 1. The initiative allows qualified electors to propose legislation. *Id.* § 1(2). The constitutional referendum power has two forms. The first form permits the legislature to refer a legislative enactment to a popular vote. *Id.* § 1(3). The second form, and the one we consider here, permits qualified electors to circulate petitions and refer to a popular vote legislation which has been enacted by their elected representatives. *Id.*

The Arizona Constitution also reserves the referendum power to the qualified electors of municipal corporations:

> The powers of the Initiative and the Referendum are hereby further reserved to the qualified electors of every incorporated city, town, and county *as to all local, city, town, or county matters on which such incorporated cities, towns, and counties are or shall be empowered by general laws to legislate.* Such incorporated cities, towns, and counties may prescribe the manner of exercising said powers within the restrictions of general laws. Under the power of the Initiative fifteen per centum of the qualified electors may propose measures on such local, city, town or county matters, and *ten per centum of the electors may propose the Referendum on legislation enacted within and by such city, town, or county.*

Ariz. Const. art. 4, pt. 1, § 1(8) (emphasis added).

In the trial court, plaintiff, acting *pro per*, initially argued that *all* city council actions are subject to referendum. Municipal corporations, however, act in several capacities: legislative, executive, administrative, and quasi-judicial. *See* 5 E. McQuillin, *The Law of Municipal Corporations* § 16.55 (3d rev. ed. 1989). The sound rationale for limiting the referendum to legislative actions is that to permit referenda on executive and administrative actions would hamper the efficient administration of local governments. *See, e.g., Witcher v. Canon City,* 716 P.2d 445, 449 (Colo.1986). Moreover, in referendum cases, "strict compliance with constitutional and statutory requirements" is required. *Western Devcor, Inc. v. Massie,* 168 Ariz. 426, 430, 814 P.2d 767, 770 (1991). The trial court correctly concluded that, under the Arizona Constitution, only the Council's legislative actions were subject to referendum. On appeal, plaintiff concedes, as she must, that the Council's actions are subject to referendum only if they are legislative. *See* Ariz. Const. art. 4, pt. 1, § 1(8). Accordingly, we now examine the Council's two challenged actions to determine whether they are legislative in character.

### II. Distinguishing Between Legislative and Administrative Acts

Although this court has previously discussed art. 4, pt. 1, § 1(8), *see, e.g., City of Globe v. Willis,* 16 Ariz. 378, 146 P. 544 (1915), we have not extensively focused on the distinction between legislative and administrative acts. In *Williams v. Parrack,* 83 Ariz. 227, 231, 319 P.2d 989, 991 (1957), opponents of an initiative that sought to enact a comprehensive scheme of employee classification, hours, salaries, and salary increases for the City's fire department argued that the proposed measure was not a proper subject for initiative because it was "administrative." Although the text of the proposed ordinance was not before the court, the court held that the title of the ordinance clearly indicated that it was

legislative.[2] *Id.* Thus, in *Williams* we implicitly recognized the distinction between legislative and administrative acts. We did not articulate, however, any test for distinguishing between them.

In *Saggio v. Connelly*, 147 Ariz. 240, 240, 709 P.2d 874 (1985), the Apache Junction City Clerk refused to place an initiative measure on the ballot for a general election. We concluded that the proposed measure was essentially "a petition demanding an election within the city at which the electorate would be asked to decide whether the city should be dissolved." *Id.* at 241, 709 P.2d at 875. Noting that legislation must be a "definite, specific act or resolution," we held that the measure was not legislation because it did not "enact anything." *Id.* Thus, *Saggio* held only that the proposed initiative measure was not legislation; it neither held that the proposed measure was administrative nor did it articulate any test for distinguishing between legislative and administrative acts.

In *Pioneer Trust Co. v. Pima County*, 168 Ariz. 61, 811 P.2d 22 (1991), we addressed the question of whether a conditional rezoning was a legislative act and, therefore, subject to referendum. *Id.* at 64, 811 P.2d at 25. The Pima County ordinances in *Pioneer Trust* permitted the Board of Supervisors to grant conditional rezoning to property owners. The zoning did not actually change until after the owner complied with the conditions and the Board of Supervisors adopted a formal zoning ordinance. *Id.* at 64–65, 811 P.2d at 25–26. Adopting a pragmatic approach and concluding that the conditional rezoning was a legislative act, we held that the Board of Supervisors made a legislative decision when they approved the conditional rezoning, and that the remaining steps prior to the zoning change merely carried out the Board's decision. In doing so, we cited the rule that an act that declares a public purpose and provides for the ways and means of its accomplishment is legislative. *Id.* at 65, 811 P.2d at 26 (citing *Lincoln Property Co. No. 41, Inc. v. Law*, 45 Cal.App.3d 230, 119 Cal.Rptr. 292 (1975)).

Other states have utilized various tests when distinguishing between administrative and legislative decisions:

Actions relating to subjects of a permanent and general character are usually regarded as legislative, and those providing for subjects of a temporary and special character are regarded as administrative. In this connection an ordinance which shows an intent to form a permanent rule of government until repealed is one of permanent operation.

\*　　\*　　\*　　\*　　\*　　\*

The test of what is a legislative and what is an administrative proposition, with respect to the initiative or referendum, has further been said to be whether the proposition is one to make new law or to execute law already in existence. The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it. *Similarly, an act or resolution constituting a declaration of public purpose and making provision for ways and means of its accomplishment is generally legislative as distinguished from an act or resolution which merely carries out the policy or purpose already declared by the legislative body.*

5 *E. McQuillin, supra,* § 16.55 at 266 (emphasis added).

The tests listed in *McQuillin* are, of course, far easier stated than applied. Other courts, noting the plethora of cases discussing the legislative/administrative act distinction, have commented that these cases are often irreconcilable. *See, e.g.,*

---

**2.** The ordinance was entitled:

An Ordinance establishing classifications of employees of the Fire Department of the City of Phoenix and fixing rates of compensation and hours of work for such employees; providing for a system of increases in such rates of compensation; prohibiting changes on certain existing ordinances and rules and regulations; repealing conflicting ordinances, defining terms, requiring an appropriation.

*Williams,* 83 Ariz. at 228, 319 P.2d at 989.

*Rauh v. City of Hutchinson,* 223 Kan. 514, 522, 575 P.2d 517, 523 (1978). With these thoughts in mind, we turn now to the Council's resolutions.

### III. The Resolutions in Question Were Administrative

Applying the tests listed in *McQuillin* to the two resolutions in question, we find that the Council's actions were not legislative. The September 17 conceptual approval was not a legislative act because, in essence, the Council had not yet finally *decided to act.* The November 5 resolution approving the Project was not a legislative act because it merely executed the legislative action taken by the qualified electors of Mesa when they voted to authorize $30 million worth of street improvement bonds. The resolution approving the Project merely carries out the purpose declared by a prior legislative act. Therefore, that resolution is administrative, not legislative.

#### A) The September 17 Conceptual Approval

■ Even if no earlier bond election had taken place, we conclude that the September 17 resolution is not subject to referendum. Plaintiff's first referendum, number 90–02, sought to refer the Council's resolution that conceptually approved widening Country Club Drive with "alignment as indicated by staff." Although the limited record before us is not perfectly clear on this point, the September 17 minutes, taken as a whole, indicate that the Council had not yet made a final decision. Therefore, the September 17 conceptual approval was not a legislative act.

One of the Council members disqualified himself from the September 17 discussion and decision, citing a conflict of interest. Although it was apparent that the remaining Council members all favored widening Country Club Drive, the Council had not yet finally committed itself to doing so. First, the Council did not allocate funding for the improvement nor authorize any construction at the September 17 meeting. Much of the meeting centered around citizens' complaints, including a lack of infor-

mation provided to them. Several council members agreed that more information was necessary. The Council discussed holding more public meetings to permit property owners to air their concerns. The September 17 minutes also reflect that the conceptual approval was considered a first, but not final, step in the process of widening Country Club Drive. At the meeting, the City Manager stated that "staff" preferred to have a specific motion and vote on the issue rather than a simple order to proceed with appraisals and other information gathering. A later City publication stated that as of October 3, 1990, the "final plan" was not scheduled to be approved until October or November. It appears that the Council, as a whole, viewed the conceptual approval as an act that authorized staff to garner more detailed information, including cost, necessary for a final decision on the matter.

The minutes, however, do give at times the appearance that a final decision had been made. One council member voted against the resolution after having stated that the public might misconstrue the conceptual approval as final approval. A later publication issued by Mesa could also be read as indicating that the widening was inevitable.

On the whole, however, the Council's September 17 actions do not demonstrate a sense of absolute commitment to or final approval of the widening. The record indicates that the Council did not commit to any cost figure or authorize any construction before or at the September 17 meeting. Therefore, we conclude that the Council did not give final, affirmative approval to the Project. *See Moore v. School Comm. of Newton,* 375 Mass. 443, 378 N.E.2d 47 (1978) (affirmative vote to close two schools constituted final passage of measure). Because no "decision" had been made, the conceptual approval could not have, and did not, establish policy, enact a law or permanent rule of government, or declare a public purpose and provide the ways and means of its accomplishment. Thus, the resolution conceptually approving the wid-

ening of Country Club Drive was not a legislative act.

This conclusion is also consistent with our recent decision in *Pioneer Trust.* In *Pioneer Trust*, we addressed the question of whether a conditional approval of an application for rezoning could be the subject of a referendum. 168 Ariz. at 64–66, 811 P.2d at 25–27. Beginning with the Arizona rule that zoning decisions are subject to referendum, *Queen Creek Land & Cattle Corp. v. Yavapai County Bd. of Supervisors*, 108 Ariz. 449, 501 P.2d 391 (1972), we noted that the Pima County ordinances allowed the Board of Supervisors to impose additional conditions on the rezoning only if those conditions were necessary to health and safety concerns. *Pioneer Trust*, 168 Ariz. at 65, 811 P.2d at 26. Once the application for conditional rezoning was approved, the only remaining steps were determining whether the landowner complied with the stated conditions and enacting a formal ordinance changing the zoning. Accordingly, we concluded that "the decision ha[d] been made," and that a conditional rezoning could be the subject of a referendum. *Id.*

Here, in contrast, *no final decision had been made.* The conceptual approval did not make a "final decision" or circumscribe the Council's freedom in any way. The Council was free to proceed with the widening or to back out once it studied the appraisal information. *Cf. Pointe Resorts, Inc. v. Culbertson*, 158 Ariz. 137, 143, 761 P.2d 1041, 1047 (1988) ("The critical factual determination ... was whether the deal was 'substantially complete,' i.e., whether the deal was 'done' as of the date of the initiative.").

▮ Arizona's Constitution permits qualified electors to refer *legislation.* It does not permit them to refer projects or bills under consideration, thought processes, or any other step preliminary to a legislative act. The conceptual approval was not a legislative act. Therefore, it was not subject to referendum.

### B) The November 5 Resolution Approving the Project

The Council's November 5 resolution did give final approval to the Project. However, the Project merely carries out the public purpose declared in the April 28, 1987 bond election. At that election, Mesa's electors approved the City's request for authorization to issue and sell $30 million of general obligation bonds to

improve, construct, reconstruct and rehabilitate the streets and highways of the City, to acquire land and interests in land for rights of way for that purpose, and to pay all costs in connection therewith.

The voters of Mesa acted in a legislative capacity when they declared a public purpose (road improvement and construction) and provided the ways and means for its accomplishment (the bond revenues). *See* 5 E. McQuillin, *supra*, at § 16.55; *see also State v. Leeman*, 149 Neb. 847, 858, 32 N.W.2d 918, 923 (1948) ("at a special election the voters of Omaha ... directed that the city council issue ... municipal bonds ... for the purpose of acquiring land and constructing thereon a municipal auditorium. This clearly was a legislative act of the electors of the city.").

The Project, as finally approved, widens Country Club Drive from five to seven lanes and constructs a portion of McKellips Road to link up in the future with the Red Mountain Freeway. Plaintiff does not dispute that the construction on either Country Club Drive or McKellips Road constitutes an improvement. Widening Country Club Drive will improve that road and will also involve construction of new lanes and possibly reconstruction of the old lanes. The McKellips Road construction is also consistent with the bond proposal's purpose of constructing "streets and highways of the City." The Project also authorizes the acquisition of the rights-of-way for both portions of the Project, another action the bond proposal authorized. Although none of the resolutions state the cost of this project, the record indicates that the City planned to sell the bonds to "front" the Project's estimated $30 million cost.

■ Thus, if McKellips Road and Country Club Drive are considered "streets and highways of the City," the Council's resolution approving the Project merely carries out the public purpose stated at the bond election. Plaintiff notes that Country Club Drive is merely the local name for State Highway 87, and argues that it is not, therefore, a street or highway of the City. No one disputes that Country Club Drive or McKellips Road, or the construction on either, are physically located *in* Mesa. Country Club Drive and McKellips Road are both roadways that a Mesa voter would clearly consider "streets" or "highways" of "the City." We conclude, therefore, that the Project is an administrative act, carrying out the public purpose established in the bond election. *See Leeman,* 149 Neb. 847, 32 N.W.2d 918; *see also City of Idaho Springs v. Blackwell,* 731 P.2d 1250 (Colo. 1987) (proposed initiated ordinances prohibiting relocating school house, which the city planned to renovate and use as the new city hall, or acquiring land for its relocation were administrative where electorate had approved an ordinance establishing a three percent sales tax to fund, among other things, a new city hall); *Lewis v. City of South Hutchinson,* 162 Kan. 104, 174 P.2d 51 (1946) (proposed ordinance stating that bonds authorized at previous election would not become valid obligations until completed plans and materials were available for construction was administrative); *Monahan v. Funk,* 137 Or. 580, 3 P.2d 778 (1931) (ordinance authorizing purchase of property for incinerating plant was administrative where Portland electorate authorized the city to issue bonds for purpose of building a new crematory or incinerating plant). Therefore, the Project is not subject to referendum. *See* Ariz. Const. art. 4, pt. 1, § 1(8).

Plaintiff has noted that the bond proposal itself did not specifically mention Country Club Drive, and argues from this that citizens had no notice that Mesa intended to use the bond funds to widen Country Club Drive. While it is true that the bond proposal was not focused on Country Club Drive, that fact does not alter our decision. The lack of specificity in a bond proposal grants the City much more leeway in deciding when and where to administer the bond funds. This lack of specificity may well be a valid reason to oppose a bond proposal. It does not change, however, the nature of the council's action from administrative to legislative.

## IV. The September 17 and November 5 Resolutions Do Not Amend the Bond Proposal

Plaintiff next contends that the challenged resolutions actually *amend,* rather than carry out, the bond proposal, and are therefore legislative acts subject to referendum. She argues first that the bond proposal requires multiple projects, not "just one massive project." Second, she argues that Country Club Drive is a state highway and, therefore, the resolutions violate the proposal's requirement that Mesa expend the funds to improve "the streets and highways of the City." Citing *Keigley v. Bench,* 97 Utah 69, 89 P.2d 480 (1939), and *Lawrence v. Schrof,* 162 N.J.Super. 375, 392 A.2d 1243 (1978), she concludes that these two aspects of the Council's resolutions were not "within the ambit of the voters' intent" when they approved the bonds, and that Mesa's electorate must approve them separately.

In *Keigley,* the Provo electorate authorized the city to issue $850,000 of revenue bonds to construct a municipal electric plant and system. The Provo Board of Commissioners subsequently passed an ordinance extending the term of principal payments from fifteen to twenty years, 89 P.2d at 482. The Utah Supreme Court held that the twenty-year plan departed from the financial policy set by the voters in the bond election, and was therefore a legislative act subject to referendum. *Id.,* 89 P.2d at 486.

In *Lawrence,* the Rahway City Council passed an ordinance authorizing the construction of a new city hall and police headquarters and $2,000,000 in bonds to finance the construction. Two subsequent ordinances increased the bond authorization to $3,000,000, and, finally, to $4,450,000, 392 A.2d at 1244. Citizens sought to refer the

ordinance that increased the bond authorization from $3,000,000 to $4,450,000. *Id.* The *Lawrence* court held that increasing the total authorized debt changed the city's financing policy for the complex. The court concluded that such a policy change was a legislative decision subject to referendum. *Id.,* 392 A.2d at 1246–47.

■ Here, in contrast to *Keigley* and *Lawrence,* Mesa did not change the bond proposal's terms or the authorized amount of indebtedness in any way. There has been no change in Mesa's policy of financing street improvements. Plaintiff's real argument is that the bond proposal did not authorize the expenditure of all of the bond monies *on a particular project.* Under our view, this argument is not supported by the record in view of the November 5, 1990, resolution authorizing a cost-sharing arrangement with the state. Even if the factual basis for this argument is supported by the record, the substance of the argument is that the bond proposal's terms have been *violated,* not *amended.* If a city makes unauthorized expenditures, the law may provide a remedy, but the expenditures do not convert a non-referable resolution into a referable one. *See, e.g., Switzer v. City of Phoenix,* 86 Ariz. 121, 123, 341 P.2d 427, 428 (1959) (elector sought declaratory judgment and injunction to prevent city from issuing street improvement bonds). In short, the remedy to prevent an unauthorized expenditure of previously-approved bond funds is not a referendum.

Plaintiff, however, also argues that *Barry v. School Dist. No. 210,* 105 Ariz. 139, 142, 460 P.2d 634, 637 (1969) stands for the proposition that "once the electors have approved a specific bond issue, that approval cannot be varied or expanded upon without submission to a separate vote." Opening Brief at 24. To the extent plaintiff reads *Barry* to require a referendum election, we disagree.

In *Barry,* the qualified voters of Phoenix Union High School District approved $16,000,000 in bonds, in part to construct an administration building. *Id.* at 140, 460 P.2d at 635. When the district wanted to begin construction, the remaining bond funds were insufficient to cover the building's estimated cost. The district then sought a property tax levy to provide the additional funds. The district argued that the previous bond authorization entitled the district to obtain the additional funds via the levy without first obtaining voter approval. *Id.* at 141, 460 P.2d at 636. This court concluded that A.R.S. § 15–445 required voter approval before the district could expend levy funds. *Id.*

*Barry* holds only that a previous vote authorizing bonds did not also authorize an additional property tax levy, and that the statute in that case required the district to obtain voter approval before expending levy funds. It does not hold that a referendum election must be held if the citizenry believe an expenditure of bond funds is unauthorized. *Barry* does not guide us at all on the issue of what the proper remedy is for an allegedly unauthorized expenditure of bond funds. As previously noted, that remedy is not a referendum.

■ Thus, we reject plaintiff's argument that the Council's resolutions amend the bond resolution earlier approved by the voters. The Council's resolutions do not change or amend in any way the bond proposal's financial terms or authorized amount. Accordingly, *Keigley* and *Lawrence* are inapposite. Finally, nothing in *Barry* requires a referendum election to have voters approve or disapprove an expenditure they believe to be unauthorized.

V. Plaintiff's Additional Arguments that the Resolutions are Legislative are Unpersuasive

Plaintiff posits three additional categories of cases which, she argues, demonstrate that the Council's actions were legislative. The first category, plaintiff argues, demonstrates that "when city councils ... act to authorize expenditures for permanent improvements, their acts are most clearly legislative and not administrative." Opening Brief at 15. Thus, plaintiff concludes that the Council's actions are legislative because they authorize the expenditure of public funds for a major, permanent public improvement.

■ Without deciding whether plaintiff's summary of these cases accurately states a proposition of law, we find this entire line of cases unpersuasive. In our view, the act that "authorized" the Project was the bond election. The Council's subsequent resolutions merely carry out that previous legislative authorization and are, therefore, administrative. *But see People v. Graham,* 70 Colo. 509, 203 P. 277 (1921) (ordinance providing for issuance of bonds to acquire property and construct park pursuant to previous ordinance submitted to and approved by tax-paying electorate held to be legislative act under City Charter provision requiring approval by entire electorate).

In particular, plaintiff relies heavily on *State v. Jacobs,* 135 Kan. 513, 11 P.2d 739 (1932). In *Jacobs,* a Hays City ordinance approved the condemnation of private property for, the court stated, "the purpose of widening Park Avenue and providing for the payment of the cost thereof." *Id.* at 514, 11 P.2d at 740. The *Jacobs* court rejected the argument that the ordinance was merely a condemnation ordinance, stating that "[t]he widening of Park Avenue and providing for the expense thereof is purely legislative in character." *Id.* at 516, 11 P.2d at 741. Accordingly, the court concluded the ordinance was subject to referendum. *Id.*

Plaintiff argues that the Council's resolutions approving the widening of Country Club Drive, like the ordinance in *Jacobs,* were legislative. We disagree. The *Jacobs* court did not address an ordinance that *carried out* a previous bond authorization, nor was that court faced with any prior legislative enactment. Hays City was not carrying out any previous legislative act because *none existed.* Thus, *Jacobs* is distinguishable because no prior legislative act existed that could be carried out or executed.

Plaintiff argues that a second line of cases teach that if a "specific enactment" was not included in an earlier general plan, that specific measure is new legislation subject to referendum. Plaintiff notes that the Mesa General Plan does not mention any proposed improvement to Country Club

Drive, and concludes that the Council's September 17 and November 5 resolutions are "specific enactments" subject to referendum. We disagree.

At the outset, we note that only two of the five cases plaintiff cites for this proposition involve general plans. Moreover, we do not read *Yost v. Thomas,* 36 Cal.3d 561, 685 P.2d 1152, 205 Cal.Rptr. 801 (1984), and *Duran v. Cassidy,* 28 Cal.App.3d 574, 104 Cal.Rptr. 793 (1972), the two cases actually featuring a general plan, to require a referendum on any specific enactment not mentioned in a general plan.

In *Yost,* the City of Santa Barbara approved amendments to its general plan, approved zoning amendments, and approved a "specific plan" for the development of a hotel and conference center on coastal land. 36 Cal.3d at 569, 685 P.2d at 1157, 205 Cal.Rptr. at 806. The *Yost* court reasoned that the elements of a specific plan under California statute were similar to the elements found in a general plan or zoning regulations. *Id.* at 570, 685 P.2d at 1158, 205 Cal.Rptr. at 807. Noting that California law considers both general plans and zoning to be legislative acts subject to referendum, the court concluded that the specific enactment was a legislative act. *Id.* The *Yost* court concluded the enactment was legislative because it was similar to two other actions that California recognized as legislative. *Yost* does not hold that a specific enactment is legislative merely because it is not mentioned in a general plan.

*Duran* also does not support plaintiff's position. In *Duran,* the Visalia general plan was amended to include the development of a multiple use regional park. 28 Cal.App.3d at 577, 104 Cal.Rptr. at 796. Five years later, the Visalia City Council authorized the construction of a municipal golf course that was to consume approximately two-thirds of the land and funds budgeted for the park. *Id.* at 577–78, 104 Cal.Rptr. at 796. Citizens circulated initiative petitions seeking to prevent the city from building and operating a municipal golf course at the park. *Id.* at 578, 104 Cal.Rptr. at 796–97.

The *Duran* court relied on two factors in holding that the decision to build and operate the golf course was a legislative act. First, the court stated that entering the business of golf course ownership was a question involving a new statement of policy. *Id.* at 581, 104 Cal.Rptr. at 799. Second, the planned golf course had altered the "quintessence" of the park from a multi-use regional park representing the general plan to a municipal golf course. *Id.* Thus, the decision to build a golf course could not be considered an implementation of the multi-use regional park stated in the general plan.

We do not read *Duran, Yost,* or any other cases plaintiff cites to hold that specific enactments not mentioned in a general plan are subject to referendum. *Reagan v. City of Sausalito,* 210 Cal.App.2d 618, 624, 26 Cal.Rptr. 775, 778 (1962) (acquisition of particular parcel of property could not be considered implementing previous policy where city conceded that "a claimed past policy" requiring waterfront lands was not legislative policy declaration); *Wheelright v. County of Marin,* 2 Cal.3d 448, 458, 467 P.2d 537, 543, 85 Cal.Rptr. 809, 815, *cert. denied,* 400 U.S. 807, 91 S.Ct. 65, 27 L.Ed.2d 37 (1970) (construction of access road to master planned community was subject to referendum); *Reynolds v. City of Independence,* 693 S.W.2d 129 (Mo.App. 1985) (vacating alleyway was legislative act). Thus, we are unpersuaded by plaintiff's second line of cases.

Finally, plaintiff argues that a third line of cases stands for the proposition that municipal actions establishing a new and important rule or policy are legislative. This is in accord with all of the authorities. *See* 5 *E. McQuillan, supra,* at § 16.55. We do not agree, however, with plaintiff's argument that these cases compel us to conclude that the Council's resolutions here were legislative. The resolutions do not establish any new law or policy with respect to Country Club Drive. Rather, the Mesa electorate approved a street improvement policy in the 1987 bond election. The Project merely carries out that policy. Moreover, the Project does not al-

ter Country Club Drive in a way that can be considered setting policy. The Project merely widens it from five lanes to seven. We cannot agree that the Project "turns" Country Club Drive into a major regional thoroughfare—it already is. A 1988 study cited in Mesa's publication states that Country Club Drive handled traffic volume of up to 49,000 vehicles per day. At the September 17 meeting, the Mayor of Mesa stated that Country Club Drive currently handled a traffic volume of over 50,000 vehicles per day. The Project merely widens and improves it to accommodate the already large volume of traffic.

The November 5 resolution simply does not announce any new policy with respect to Country Club Drive. Widening a street following a bond proposal approving that very purpose is distinguishable from, for example, deciding to fluoridate a city's water supply, *State v. Strahm,* 374 S.W.2d 127 (Mo.1963), authorizing an additional amount of public housing, *Scroggins v. Kerr,* 217 Ark. 137, 228 S.W.2d 995 (1950), or imposing a new tax, *Citizens for Financially Responsible Government v. City of Spokane,* 99 Wash.2d 339, 662 P.2d 845 (1983). Thus, we are unpersuaded by plaintiff's third and final line of cases.

## CONCLUSION AND DISPOSITION

The two actions of the Mesa City Council which are challenged on appeal are not legislative in character and thus are not subject to referendum. For the reasons stated in this opinion we affirm the trial court. The Mesa electorate spoke in 1987 when it approved the bond proposal. If there are those who disagree with the Council's actions in implementing the bond proposal, their remedy does not lie in Arizona's referendum laws.

Affirmed.

GORDON, C.J., and CAMERON, J., concur.

CORCORAN, Justice, specially concurring:

I cast my lot with the majority only because I believe it applies traditional con-

cepts of what is legislative and what is administrative to this referendum. This case is made difficult because *all* of the money realized from the approval of the Bond Election by the voters of Mesa is committed to one project. If we were faced with only one project of $1 million of 30 such projects, perhaps we all could agree with the majority.

In many bond elections throughout the state, the *specific projects* to which designated proceeds of a bond election will be committed are precisely set forth. Perhaps the legislature, boards of supervisors, and city councils should consider tying specific projects to the bond election so that not only will voters know the amount of indebtedness to be incurred and the general purpose for which bond proceeds will be used, but will also know specifically for what project precise sums of money will be used. In that way, informed voters can make informed choices.

FELDMAN, Vice Chief Justice, dissenting.

The court adopts no specific test for distinguishing between legislative and administrative acts. In applying a variety of tests, the court neglects the fundamental question: at what point could citizens of Mesa opposed to the widening of Country Club Drive reasonably have been expected to challenge the project through a referendum? The court holds that the April 1987 bond measure, approved by the voters, was the relevant legislative enactment. Because I believe this misapplies the proper test and effectively denies citizens any meaningful referendum rights in this and similar cases, I must dissent.

The majority does not apply the pragmatic method we followed in *Pioneer Trust Co. v. Pima County,* 168 Ariz. 61, 811 P.2d 22 (1991), in which we insisted on "[l]ook-

ing at [a zoning matter] realistically." *Id.* at 65, 811 P.2d at 26. We adopted "the time of conditional rezoning as the triggering time for a referendum," in part because it "provides a bright-line rule easily ascertainable by all interested parties." *Id.* at 66, 811 P.2d at 27. We betray those principles if we deny a citizen the right to refer a municipal ordinance because she took a bond election for what it was: a measure to *raise money* for future *unspecified* street improvements. It is likewise inconsistent to permit referenda on minor zoning amendments, as in *Pioneer,* but not to permit a referendum on a city council's decision to spend $30 million to convert a specific street into a major regional "super street."

The court holds that the Council's November 5 resolution, which gave final approval to the Project, was not a legislative act because it merely carried out the policy declared in the bond election. The bond measure authorized the city to raise $30 million for the very general purpose of constructing and improving the city's streets. The measure did not, however, establish even as a matter of general city policy that *Country Club Drive* should be a major component of a regional traffic-flow network. In reaching a contrary conclusion, the court relies on a tenuous syllogism: the bond election established the policy of improving the city's streets; Country Club Drive is a street in the city; therefore, the bond election established the policy of improving Country Club Drive. 169 Ariz. at 491, 821 P.2d at 153.[3]

The April 1987 bond proposal mentioned neither Country Club Drive nor any other street. Its broad policy of raising money to improve the city's streets was a purpose that many residents of a fast-growing city might support, even if opposed to any particular street-widening project.[4] It is total-

---

3. The court's attempt to distinguish *State v. Jacobs,* 135 Kan. 513, 11 P.2d 739 (1932), also turns on its finding the bond election to be the relevant legislative act. *Jacobs* held that an ordinance approving the widening of a street and providing for the expense thereof was legislative. The majority argues that *Jacobs* is distinguishable because in that case there had been

no other legislative act prior to the challenged ordinance. 169 Ariz. at 493, 821 P.2d at 155.

4. The majority claims that this "lack of specificity may well be a valid reason to oppose a bond proposal," but itself recognizes that a certain degree of flexibility is a necessary part of bond funding. At 491, 821 P.2d at 153.

ly unrealistic to expect that citizens opposed to the improvement of Country Club Drive would commence referendum procedures unless and until the Council had directly committed to improve Country Club Drive in some specific manner. Not until the Council passed the resolutions in question was Country Club Drive officially slated for improvement. Plaintiff exercised her referendum rights as soon as the Council finalized its commitment to improve Country Club Drive. Had plaintiff attempted to refer the issue of Country Club Drive earlier—for example, when the Council adopted an amended General Plan in May 1988—her petition likely would have been challenged as legally premature; the Council could have taken the position that it had not yet committed to undertake any specific improvement.

In the principal cases cited by the majority, the implementing ordinances that were held to be administrative acts were all preceded by legislation specific at least in the type of improvement to be constructed. In *State v. Leeman*, 149 Neb. 847, 32 N.W.2d 918, 923 (1948) the electors approved a bond measure to acquire land and build a municipal auditorium on it. The court found a later ordinance executing these acts to be administrative. In *Monahan v. Funk*, 137 Or. 580, 3 P.2d 778, 780 (1931), the voters authorized the city council to acquire property "and to construct thereon a new crematory." The court held that the council's subsequent ordinance directing a commissioner to purchase a tract of land was non-referable. See also *City of Idaho Springs v. Blackwell*, 731 P.2d 1250 (Colo. 1987) (ordinance establishing three percent sales and use taxes to fund prioritized projects including a city hall was legislative act; subsequent resolution to purchase a parcel and to move a building to that parcel for use as city hall was administrative act).

In all of these cases, citizens concerned about the construction of an auditorium, crematory, or city hall could reasonably have been expected to challenge them at the time the enabling legislation was enacted. Although the ordinances referred in these cases were unclear as to the location of the project, they were specific enough about what was being built that anyone who might support the project as a general matter but be opposed to it being built, for example, in their neighborhood would be motivated to mount a referendum campaign. By broadening this line of authority to encompass the matter at hand, the majority inappropriately restricts plaintiff's referendum rights. Moreover, even these cases overly restrict the scope of municipal decisions subject to referendum because they hold ordinances that specify the type of improvement but not the location to be legislative and subsequent ordinances specifying a site to be administrative.

Cases like this should be decided by determining whether the challenged ordinance or resolution commits to a specific project at a particular location and pertains to an improvement of such general importance or magnitude as is likely to concern and interest the body of citizens of the municipality as a whole. *See Hopping v. City of Richmond*, 170 Cal. 605, 150 P. 977 (1915) (council's resolution effectively committed city to build a city hall, to build it on land offered to city for that purpose, and was therefore legislative act). If so, the enactment is legislative in nature, is therefore subject to the referendum, and all subsequent implementing enactments are administrative acts.

In the case before us, the November 5 ordinance is the measure that, for the first time, specified both the nature of the improvement and its location. The improvement contemplated is not confined to a small area but requires the redesign and reconstruction of much of a main commercial street at a very significant cost, with the city's expenditures to be financed by general obligation bonds. In my view, if the right of referendum is to have any real meaning, the November 5 ordinance was a legislative act subject to referendum.