761 P.2d 1041

The POINTE RESORTS, INC., an Arizona corporation; and Gosnell Development Corporation, an Arizona corporation, Appellees/Cross-Appellants,

v.

Donna CULBERTSON, in her official capacity as Clerk of the City of Phoenix; Alex Cordova, in his official capacity as Deputy Clerk of the City of Phoenix; and The City of Phoenix, a body politic, Appellees,

and

Ruth Hamilton, Charles M. Monroe, and Dora Quesada, Appellants/Cross-Appellees.

No. CV-87-0362-AP.

Supreme Court of Arizona.

Sept. 13, 1988.

**138**

Gammage & Burnham by Grady Gammage, Jr., Richard K. Mahrle and Karen L. Schroeder, Phoenix, for Pointe Resorts and Gosnell Development.

Roderick G. McDougall, Phoenix City Atty. by Larry F. Felix, Asst. City Atty., Phoenix, for City of Phoenix, Culbertson and Cordova.

Cox and Cox by Z. Simpson Cox and Alfred S. Cox and Fujii, Shaw, Yen, Hobson & Pilch by Robert E. Yen and William R. Hobson, Phoenix, for Hamilton, Monroe and Quesada.

MOELLER, Justice.

## JURISDICTION

Appellants Ruth Hamilton, Dora Quesada and Charles Monroe (Hamilton) appeal from a final judgment entered in Maricopa County Superior Court in favor of The Pointe Resorts, Inc., and Gosnell Development Corporation (Gosnell). The trial court ruled that Proposition 100, an initiative measure, effective January 14, 1987, which prevents the Phoenix City Council from disposing of city mountain preserve land without voter approval, did not affect an earlier land-trade leaseback transaction between Gosnell and the City of Phoenix (City). Hamilton had also sought, by refer-
endum, to submit the challenged transaction to a vote of the people. The city clerk found the referendum petition signatures to be insufficient, and the trial court ruled that Hamilton's attempt to challenge that finding was untimely. Hamilton appealed both rulings directly to this court. Gosnell filed an alternative cross-appeal challenging the trial court's ruling that the method the City used to permit *withdrawal* of referendum petition signatures was invalid. No stay of the judgment was sought or entered. The agreement between Gosnell and the City has been fully executed pending appeal. Gosnell has constructed the contemplated golf course on some of the land involved.

We have jurisdiction of this direct appeal pursuant to A.R.S. §§ 19–122(C) (Supp. 1987) and 19–141(C). We affirm.

## FACTS

At a special election in November 1985, Phoenix voters adopted Proposition 115, relating to the City of Phoenix Mountain Preserves. The adoption of the measure added Chapter 26 to the City Charter. Section 2 of Chapter 26 provides:

In no event shall any real property within any City Mountain Preserve be sold, traded or otherwise alienated, redesignated or deleted from the Mountain Preserve except by approval of a majority of the electors voting thereon, provided that Mountain Preserve property may be traded if such trade is approved by the Council by ordinance prior to January 1, 1989 in accordance with the provisions set forth in this Chapter.

On March 26, 1986, in accordance with this newly adopted Proposition, the Phoenix City Council passed Ordinance No. S16367 (the ordinance) authorizing the city manager or his designee "to enter into an agreement and execute necessary documents to effect a trade of 29 acres of City-owned land located at the southeast edge of South Mountain Park ... for 34 acres of land owned by Gosnell Development Corporation." The ordinance was conditioned on the requirement that Gosnell would then donate the twenty-nine

acres back to the City and the City would execute a thirty-five-year lease granting Gosnell the right to use the land for five holes of a public golf course. The lease would also give Gosnell an option to renew for another thirty-five years. As we have previously had occasion to note, no form of lease was attached to the ordinance, no rental payments were specified in the ordinance itself, and no legal descriptions were given for the lands involved. *Hamilton v. Superior Court*, 154 Ariz. 109, 110, 741 P.2d 242, 243 (1987).

The same day that the council adopted the ordinance, Hamilton took out a petition to suspend its operation until it was put to a vote of the electorate of the City of Phoenix. Referendum, R–1–86. The city clerk's office informed Hamilton that she had thirty days from March 26, 1986, to file a sufficient number of qualified signatures, in this case 8,306, to prevent the ordinance from taking effect. Additionally, the clerk stated that if she found the signatures filed within the initial thirty-day period to be insufficient, Hamilton would have ten days after the declaration of insufficiency to file supplemental signatures pursuant to § 12–116 of the Phoenix City Code.

On April 24, 1986, Hamilton filed petitions containing more than 13,000 signatures. The city clerk determined that only 7,101 signatures were valid and, on May 22, 1986, issued a certificate of insufficiency. Following the procedures set forth in § 12–116, Hamilton then filed an additional 6,084 signatures within the specified ten days. After reviewing these additional signatures, the city clerk certified that there were a sufficient number of valid signatures to place the matter on the ballot.

Meanwhile, upon learning that the supplemental filing provisions of § 12–116 of the City Code were being utilized in an attempt to save the referendum drive, Gosnell filed suit in Superior Court on May 23, 1986, seeking to have declared invalid (1) the form of the referendum petition, (2) Phoenix City Code Art. IV, § 12–116, which permitted the supplemental filing of referendum petitions, and (3) the signatures on some of the referendum petitions. On June 16, 1986, Hamilton filed an answer to the Gosnell suit and, by cross-claim against the City, sought, for the first time, to challenge the city clerk's certificate of insufficiency of May 22, 1986.

On June 25, 1986, in a formal judgment containing Rule 54(b) language, the trial court ruled that Phoenix City Code Art. IV, § 12–116 violated the Arizona Constitution, A.R.S. § 19–142, and Chapter XVI of the Phoenix City Charter. On December 15, 1987, this court affirmed the judgment, agreeing with the trial court that § 12–116 was in conflict with Chapter XVI of the Phoenix City Charter. *See The Pointe Resorts, Inc. v. Culbertson*, 156 Ariz. 158, 750 P.2d 1361 (1987).

On March 26, 1986, the same day on which Hamilton took out referendum petition R–1–86, she also took out a petition to initiate an amendment to the Phoenix City Charter. The initiative amendment (Proposition 100) would close the "window" which permitted the Phoenix City Council to approve trades of Mountain Preserve land without voter approval until January 1, 1989. *Hamilton*, 154 Ariz. at 110, 741 P.2d at 243.

Hamilton's efforts were successful and the Phoenix city clerk's office certified the initiative petition's signatures as sufficient. On December 9, 1986, the Phoenix electors overwhelmingly approved the proposition which provided:

AN INITIATIVE MEASURE TO PREVENT SALE, TRADE, ALIENATION, REDESIGNATION, LEASE OR OTHER DELETION OR REMOVAL OF ANY CITY MOUNTAIN PRESERVE LAND WITHOUT APPROVAL OF A MAJORITY OF ELECTORS VOTING THEREON.

Notwithstanding any other provision of the Charter of the City of Phoenix, no land within any City Mountain Preserve, as that term is defined in Chapter 26 of the Charter of the City of Phoenix, shall be sold, traded, alienated, redesignated, leased or otherwise deleted or removed from the Mountain Preserve except by

approval of a majority of electors voting thereon.

*Id.*

The initiated charter amendment became law on January 14, 1987. Thereafter, Hamilton filed a supplemental answer and cross-claim in Gosnell's superior court case contending that the adoption of the initiative prevented the City from executing Ordinance S16367. Hamilton asked the court to dismiss Gosnell's case and to declare that the City was prohibited from leasing or conveying any Mountain Preserve property to Gosnell except upon approval of a majority of Phoenix electors.

Cross-motions for summary judgment were filed. On April 7, 1987, the superior court granted Gosnell's motion for summary judgment and denied Hamilton's, holding that Proposition 100 had no effect on the trade-leaseback arrangement authorized by Ordinance No. S16367. Hamilton filed a petition for special action in this court seeking to prohibit the execution of the trade-leaseback agreements. This court accepted jurisdiction of the special action and, in a 3–2 decision, vacated the trial court's summary judgment and remanded the matter to the trial court to determine the status of the transaction between Gosnell and the City as of January 14, 1987. In its opinion, this court directed the trial court to take evidence and determine whether:

> [O]n the effective date of the 1987 initiative, an agreement had been reached so that, legally or equitably, GDC (Gosnell) could have required the City to proceed with the trade-leaseback. If so, the 1987 initiative could not undo that which had been done. If no such agreement had been reached, the 1987 initiative prevents consummation absent approval by the electorate.

*Id.* at 112, 741 P.2d at 245.

On remand, the trial court gave all parties an opportunity to submit additional evidence relative to the status of the transaction as of January 14, 1987. After considering all of the evidence, the trial court made detailed findings of fact and concluded that the trade-leaseback transaction was complete prior to January 14, 1987. The trial court also declared the referendum petitions invalid because of improper wording and rejected Hamilton's cross-claim challenge to the city clerk's certificate of insufficiency as untimely. Also incorporated into the trial court's final judgment was a ruling in favor of Hamilton holding that the method used by the City to permit withdrawal of referendum petition signatures was invalid. Gosnell attacks this ruling by an alternative cross-appeal.

## ISSUES

Because of the manner in which we resolve the issues, the only three issues are:

1. Is this appeal moot because the Gosnell–City trade-leaseback agreement has been fully executed pending appeal and the golf course has been constructed?

2. If the appeal is not moot, did the trial court correctly find that the trade-leaseback agreement between the City and Gosnell was "legally or equitably" enforceable before January 14, 1987, the effective date of Proposition 100?

3. If the appeal is not moot, did the trial court correctly conclude that Hamilton's challenge to the city clerk's certificate of insufficiency was untimely?

We hold that the case is not moot, that the trial court's finding that the deal was "done" before January 14, 1987, is correct, and that the trial court's ruling on the untimeliness of Hamilton's challenge to the clerk's certificate of insufficiency is correct. Accordingly, we affirm the trial court's judgment, and do not consider the propriety of the trial court's rulings concerning the validity of the referendum petitions or the issue presented by the alternative cross-appeal.

## MOOTNESS

Gosnell maintains that this appeal is moot because the completion of the trade-leaseback transaction and the construction of the golf course have made the relief sought meaningless. Generally the mootness doctrine requires that judicial opinions not be rendered concerning issues which no

longer exist because of changes in the factual circumstances. *Ash, Inc. v. Mesa Unified School Dist. No. 4,* 138 Ariz. 190, 673 P.2d 934 (App.1983), *vacated in part on other grounds sub nom. Marcus v. Fox,* 150 Ariz. 333, 723 P.2d 682 (1986).

■ Mootness is not solely a jurisdictional doctrine, however. It is also founded in part on policy considerations and the question of mootness is one of convenience and judicial discretion. *See* 1A C.J.S. *Actions* § 40 (1985). Moreover, usually a defendant cannot by its own voluntary conduct "moot" a case and deprive a court of jurisdiction. *Ball v. Chandler Imp. Dist.,* 150 Ariz. 559, 724 P.2d 1228 (App.1986).

On October 23, 1987, Gosnell filed in this court an exhaustive motion to dismiss this appeal on grounds of mootness. The motion was joined in by the City and was opposed by Hamilton. The motion was extensively briefed and the respective positions were supported by many exhibits. On November 24, 1987, this court denied the motion.

■ Gosnell suggests we revisit that motion "now that the issues on appeal have been fully briefed." The extensive briefs and exhibits earlier submitted made us aware of the issues at the time we denied the earlier motion. We have found no reason in the record to revisit our earlier ruling. Thus, we adhere to our view that this appeal is not moot.

## STATUS OF THE TRANSACTION ON JANUARY 14, 1987

The trial court's proceedings on this aspect of the case were held pursuant to the special action relief we granted in *Hamilton,* 154 Ariz. 109, 741 P.2d 242. In that opinion we said:

> When is a transaction no longer pending so that it must be considered complete and outside the reach of the 1987 initiative? If the transaction had reached the point where, if one of the parties had changed its mind as to the terms or decided to withdraw, the other party could require the first to perform, we believe the transaction would have to

be considered as no longer pending and as having been substantially completed, even though all the formal documents might not have been executed.

*Id.* at 111, 741 P.2d at 244 (1987).

Applying this formulation, the trial court found:

(1) The material and essential terms of the exchange, except for the exact legal description, were agreed upon on March 26, 1986, upon passage of the ordinance.

(2) The exact legal description was agreed upon by November 1986.

(3) The material and essential terms of the lease agreement, except for the exact legal description of the property, were agreed upon by July 1986. The parties had been identified, and the consideration and the terms of the lease were agreed upon prior to July 1986. In addition, by July 1986, agreement had been reached on the final form of the lease.

(4) The parties had manifested their respective assents to the exchange and the lease by December 1986.

(5) GDC had spent quite a bit of money relying upon the deal and complying with the requirements thereof.

(6) The Phoenix City Council did not have to approve any more aspects of the deal.

(7) Any negotiations between the parties after the initiative did not relate to provisions that were essential and material to the lease. Moreover, the negotiations involved new terms to the lease and if those terms were agreed upon they would constitute amendments to the already-consummated deal.

(8) The deal was substantially completed prior to January 14, 1987, and an agreement had been reached so that equitably or legally GDC could have required the City of Phoenix to proceed with the transaction.

Based on these findings, the trial court granted judgment for Gosnell and the City, holding that the transaction was not subject to the initiative of January 14, 1987. The trial court's findings of facts will be adopted on appeal unless they are clearly erroneous. *Smith v. Melson, Inc.,* 135

Ariz. 119, 121, 659 P.2d 1264, 1266 (1983). Our examination of the record demonstrates that there is ample evidence to support the trial court's factual findings.

■ Hamilton's principal attack on the judgment is not a factual one but is, instead, a legal one. She contends that *Barron G. Collier, Inc. v. Paddock*, 37 Ariz. 194, 291 P. 1000 (1930), controls this case. In *Collier* this court held that compliance with Chapter XIX, Section 1 of the Phoenix City Charter applies to a lease or trade by the City.

*Collier* was first injected into this case on May 12, 1987, following oral argument on the petition for special action in *Hamilton,* when counsel for Hamilton filed a supplemental citation of legal authorities first referring the court and counsel to *Collier* and to Section 1. These citations had not been referred to in the briefs or oral argument, and they were not referred to in our opinion of May 27, 1987.

Section 1 states:

All contracts shall be drawn under the supervision of the city attorney, must be in writing, executed in the name of the City of Phoenix by the Manager, *except as it may be otherwise provided either by this Charter or by law,* and must be countersigned by the city clerk, who shall number and register the same in a book kept for that purpose.

(Emphasis added.)

In *Collier,* we held that compliance with Section 1 was essential to the creation of an enforceable contract with the City of Phoenix. Additionally, *Collier* held that an equitable contract could not be created with the City and rejected the argument that the City could be estopped to deny the existence of a contract despite failure to comply with Section 1. Hamilton argues that *Collier* requires us to hold that because the formalities required by the Charter were not completed until July 31, 1987, six and one-half months after the initiative date, no binding contract was in existence on the date the initiative went into effect.

The trial court concluded that *Collier* was not dispositive because of this court's earlier decision in this case wherein the majority held that the subject transaction could be considered as completed and no longer pending (and therefore outside the reach of the initiative) *even though all the formal documents might not have been executed. Hamilton,* 154 Ariz. at 111, 741 P.2d at 244. The trial court quite accurately noted that if the only inquiry in this case was whether the documents were executed, this court would not have found it necessary to remand.

*Collier* is quite distinguishable from the present case because in *Collier* the legislative body, the City Council, had never acted by ordinance to adopt the contract, whereas, in this case, the council expressly approved the transactions by affirmatively enacting Ordinance No. S16367 on March 26, 1986. The trial court correctly found that no further action was required by the Phoenix City Council. The law relevant here is not the *Collier* case, but rather, the law applied by this court in this case: If the "deal was done" prior to January 14, 1987, it cannot be undone by the 1987 initiative.

Additionally, in *Collier,* there was no suggestion that there was an alternative to application of Section 1. However, that section itself provides that all contracts shall be drawn in accordance with this section *"except as it may be otherwise provided, either by this Charter or by law ..."* (Emphasis added.) That language clearly contemplates the possibility of other methods of contracting. In this case, Proposition 115, Section 2 of Chapter 26 of the Phoenix City Charter, expressly allowed the Phoenix City Council to enter into trade agreements for mountain preserve land. That proposition—a charter provision—provided an alternative to Section 1 here.

Neither party to the agreement itself disputes that it was bound by the agreement prior to the effective date of the initiative. The contention that they were not bound comes only from strangers to the agreement. Both contracting parties relied upon the fact that they had reached an agreement in taking other steps and performing other acts in reliance on the

finality of the agreement. This reliance and the expenditures made by the parties before the initiative make clear that neither of them could have reneged without legal consequences. Actions taken by the parties in reliance on the agreement are evidence that they understood they had an agreement and are further evidence of their intent to be bound. Restatement (Second) of Contracts, § 34(3) (1981).

■ The performance and reliance undertaken certainly show that, had the City attempted to back out, Gosnell would have had a claim of "legal consequence" against Phoenix—at least for the expenses which Gosnell had incurred at the City's request. *See, e.g., Holbrook v. Girand,* 52 Ariz. 291, 80 P.2d 695 (1938) (recognizing that one who has entered into an agreement with a city in good faith and relied thereon may recover in *quantum meruit* even if the contract is invalid for failure to follow city policies). The critical factual determination for the trial court was whether the deal was "substantially complete," i.e., whether the deal was "done" as of the date of the initiative. As to that question, there is ample evidence to support the trial court's factual determinations, and it is therefore our duty to affirm the finding.

## TIMELINESS OF HAMILTON'S CHALLENGE TO THE CITY CLERK'S CERTIFICATE OF INSUFFICIENCY

The city clerk issued a certificate of insufficiency on May 22, 1986, declaring that the referendum promoters had failed to gather enough valid signatures to require an election. On June 16, 1986, as part of her cross-claim in the suit which Gosnell brought on May 23, 1986, Hamilton, for the first time, challenged the certificate of insufficiency. The trial court held that A.R.S. § 19–121.03(B) required that Hamilton's challenge be filed within ten days of the issuance of the certificate of insufficiency. Because it was not, the trial court refused to entertain the challenge.

■ Hamilton maintains that the ten-day limitation in A.R.S. § 19–121.03(B) does not apply to this controversy. The Arizona Constitution provides that incorporated cities, towns and counties may prescribe the manner of exercising the powers of the initiative and referendum, but must do so "within the restrictions of general laws." Ariz. Const. art. IV, pt. 1, § 1(8). The Phoenix City Charter includes the following provision relating to the exercise of the referendum power:

> The applicable requirements, limitations and authorities of Article IV, Part 1, Section 1 of the Constitution of Arizona as now constituted and provisions of Title 19, Chapter 1, Articles 1, 2, 3 and 4, Arizona Revised Statutes, as now constituted *and hereafter amended,* relating to the powers of referendum, are hereby adopted as the provisions of this charter governing the manner of exercising the referendum powers herein reserved.

Phoenix City Charter, Chap. XVI, Sec. 2 (emphasis added).

Article 3 of Title 19, Arizona Revised Statutes, contains various statutory provisions dealing with the filing and certification of petitions and elections. Among those statutes is A.R.S. § 19–121.03(B):

> Any citizen may challenge in the superior court the certification made by a county recorder pursuant to § 19–121.02 [the statute dealing with certification of valid signatures on petitions] *within ten days* of the receipt thereof by the secretary of state. . . .

(Emphasis added.)

At the municipal level the roles of the county recorder and the secretary of state are essentially merged into the office of the city clerk, who both receives the petitions and is responsible for verifying the signatures. Phoenix City Code Art. VII §§ 12–114 through 12–118; A.R.S. § 19–141(A). Therefore, with the other incorporated provisions of Article 3 of Title 19 of the Arizona Revised Statutes, § 19–121.03(B) applies to the referendum in issue.

To hold otherwise would be nonsensical. The *only* existing jurisdictional statute in Arizona on signature challenges is A.R.S. § 19–121.03. That statute and its provisions must of necessity apply here or there

is no machinery by which the courts could review the clerk's actions at all. A.R.S. § 19–121.03(B) parallels provisions in the rest of Title 19 by providing strict and consistent ten-day time limits for challenges to petition matters.[1] Those time limits must apply here or *no* time limit exists on challenging the clerk's actions. Time limits are critical in election matters. It would be intolerable to permit local challenges with no time limits while imposing a ten-day deadline for statewide elections.

■ Hamilton also contends that the ten-day period prescribed by § 19–121.03(B) does not apply because the form contemplated by § 19–121.02 to be used by county recorders is something other than the clerk's certificate. Because of the interplay between the various constitutional, statutory and local provisions, we reject this argument. In the case of a city election, the document providing notice of insufficiency is the clerk's certificate. Next, Hamilton contends the ten-day period could not begin running until the city clerk had supplied her with a certificate exactly conforming with the form set forth in A.R.S. § 19–121.02. It is clear, however, that certain aspects of § 19–121.02 only apply to situations in which a county recorder is providing information to the secretary of state. Those provisions have nothing to do with the time-to-file requirement enumerated in § 19–121.03(B).

The real issue in this case should be whether Hamilton was fairly informed of the city clerk's decision that the signatures were insufficient so as to comport with basic due process requirements. The fact critical to Hamilton was that the clerk had determined that an *insufficient* number of valid signatures had been filed in connection with the City of Phoenix referendum No. R–1–86. The city clerk properly provided him the information on May 22, 1986. That notice made the proponents of the referendum "aggrieved parties," and that is the date from which the ten-day time

period ran. Moreover, while the Certificate of Insufficiency itself did not break down the various categories of allegedly invalid signatures, the record shows that the proponents of the referendum were given a sheet of paper that contained that information. The same information was also distributed to the press and widely disseminated. There is no basis for Hamilton's argument that she was not put on adequate notice on May 22, 1986.

■ Lastly, Hamilton argues that filing her cross-claim within ten days of May 22, 1986, would have been "premature." She relies on § 12–116 of the Phoenix Code which allowed for a ten-day supplemental period to file additional signatures on referendum petitions. As previously noted, that section was invalidated both by the trial court and also by this court in *The Pointe Resorts, Inc. v. Culbertson*, 156 Ariz. 158, 750 P.2d 1361 (1987).

The complaint filed by Gosnell on May 23, 1986, contained a direct challenge, which proved successful, to the validity of the supplementation ordinance. Thus, Hamilton was on notice that the supplemental signatures were challenged when she still had nine of the allowable ten days to file a timely challenge to the city clerk's certificate of insufficiency. It is also noted that the challenge wasn't even filed within ten days of the filing of the supplemental signatures. The challengers placed themselves at risk by not filing their challenge to the city clerk's Certificate of Insufficiency within the ten days provided by statute.

We conclude that the trial court properly refused to entertain the challenge to the city clerk's determination that the referendum signatures were insufficient. This being the case, we do not consider the correctness of the trial court's other rulings concerning the alleged insufficiencies of the petitions themselves, nor do we consider the issue presented in the cross-appeal.

1. Examples of other ten-day limits on challenges include: A.R.S. § 19–121.03(A) (ten days to seek mandamus against Secretary of State's refusal to certify); § 19–122(C) (ten days to appeal to Supreme Court on petition sufficiency); § 19–208.04(A) (ten days to seek mandamus against recorder on recall certifications); and § 19–208.04(B) (ten days to challenge recall signature determination and ten days to appeal to Supreme Court).

## CONCLUSION AND DISPOSITION

The appeal is not moot. The trial court properly found, under our earlier opinion, that the transaction was completed prior to the effective date of the initiative. Hamilton's challenge to the clerk's determination that there were insufficient signatures to require a referendum election was untimely. The trial court's judgment is affirmed.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and HOLOHAN, JJ., concur.