SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| TRANSPORTATION INFRASTRUCTURE MOVING ARIZONA'S ECONOMY, a political committee registered with the Arizona Secretary of State; THOMAS ZIEMBA, an individual, | ) ) ) ) ) ) | Arizona Supreme Court No. CV-08-0275-AP/EL Maricopa County Superior Court No. CV2008-019561 |
| Plaintiffs/Appellants, | ) ) ) | |
| v. | ) ) | **O P I N I O N** |
| JANICE K. BREWER, in her official capacity as Secretary of State; and HELEN PURCELL, in her official capacity as Maricopa County Recorder, | ) ) ) ) ) ) | |
| Defendants/Appellees. | ) ) ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Mark F. Aceto, Judge

**AFFIRMED**

_____

PERKINS COIE BROWN & BAIN P.A.                                    Phoenix
    By   Paul F. Eckstein
       Charles A. Blanchard
       Rhonda L. Barnes
       M. Bridget Minder
       Craig A. Morgan
       James E. Barton, II
Attorneys for Transportation Infrastructure Moving Arizona's
Economy and Thomas Ziemba

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                           Phoenix
    By   Mary R. O'Grady, Solicitor General
       Barbara A. Bailey, Assistant Attorney General
       Tanja K. Shipman, Assistant Attorney General
Attorneys for Janice K. Brewer, Arizona Secretary of State

COPPERSMITH GORDON SCHERMER & BROCKELMAN PLC                Phoenix
     By   Andrew S. Gordon
Attorneys for Amici Curiae Professional Firefighters
of Arizona, Kimberly A. Demarchi, Andrew S. Gordon,
Thomas K. Irvine, and J. Grant Woods
_____

**H U R W I T Z**, Justice

¶1      The issue before us is whether the superior court erred in dismissing claims by appellants Transportation Infrastructure Moving Arizona's Economy and Thomas Ziemba (hereafter collectively referred to as "TIME") that the Secretary of State violated A.R.S. § 19-121.01 (2002) in her review of an initiative petition concerning the Arizona transportation system.

**I.**

**A.**

¶2      Our constitution reserves to the people the legislative power of initiative. Ariz. Const. art. 4, pt. 1, § 1(2).  That right is exercised by filing an initiative petition with the Secretary of State not less than four months before the date of a general election.  *Id*. § 1(4).  A legislative measure properly proposed by initiative is referred to the people at the next general election.  *Id*. § 1(5).

¶3      To qualify for the ballot, an initiative petition proposing legislation must be signed by ten percent of all qualified electors.  *Id*. § 1(2).  The number of qualified

2

electors is "[t]he whole number of votes cast for all candidates for Governor at the general election last preceding the filing of" the initiative petition. *Id.* § 1(7).

¶4 The legislature has enacted a detailed scheme for determining whether the sponsors of an initiative have submitted sufficient signatures. *See* A.R.S. §§ 19-121 to -122 (2002 & Supp. 2007). That process begins when "petition sheets" containing signatures are submitted to the Secretary of State. The initiative petition is then deemed filed and the Secretary issues a receipt "based on an estimate . . . of the purported number of sheets and signatures filed." A.R.S. § 19-121(B).

¶5 The Secretary has twenty days from the date of filing, excluding weekends and holidays, to "remove" certain signature sheets and individual signatures under A.R.S. § 19-121.01(A).[1] The Secretary is required to disqualify entire signature sheets for specified reasons. A.R.S. § 19-121.01(A)(1). The Secretary next reviews the remaining sheets and removes signatures by electors not from the county with the most signers on a sheet.

---

[1] Until this year, the period for removal was fifteen days. *See* A.R.S. § 19-121.01(A) (2002). On May 27, 2008, emergency legislation was enacted extending the time period to twenty days. 2008 Ariz. Sess. Laws, ch. 244, §§ 3, 7 (2d Reg. Sess.). Because this legislation was not precleared by the United States Department of Justice under section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (2000), until July 31, 2008, the Secretary completed removal of signatures from TIME's signature sheets within the previously applicable fifteen-day period.

3

A.R.S. § 19-121.01(A)(2). The Secretary also must remove individual signatures that are missing required information, exceed the permitted number of fifteen signatures per sheet, or have been withdrawn. A.R.S. § 19-121.01(A)(3). The Secretary then counts the total sheets and signatures that have not been removed and issues a receipt to the initiative sponsor specifying the total number of sheets and signatures "eligible for verification." A.R.S. § 19-121.01(A)(4)-(6).

¶6 If the number of signatures eligible for verification "equals or exceeds the constitutional minimum," the Secretary then selects at random five percent of the remaining signatures. A.R.S. § 19-121.01(B). The sample must "be drawn in such a manner that every signature eligible for verification has an equal chance of being included." *Id.* The Secretary must "reproduce a facsimile of the front of each signature sheet" containing a signature selected for the sample and transmit these facsimiles to the county recorders. A.R.S. § 19-121.01(C).

¶7 A second phase of the verification process then begins. The county recorders have fifteen days to determine whether signatures in the random sample should be disqualified

for various reasons.  A.R.S. § 19-121.02(A) (Supp. 2007).[2]  The recorders must then certify their determinations to the Secretary.  A.R.S. § 19-121.02(B).  The recorders also "[s]end notice of the results" to the initiative sponsor.  A.R.S. § 19-121.02(D)(2).

¶8        After receiving the certifications from the county recorders, the Secretary has seventy-two hours, excluding weekends and holidays, to certify the total number of valid signatures.  A.R.S. § 19-121.04(A).[3]  The starting point is the number of eligible signatures determined under § 19-121.01(A)(6) — the number from which the Secretary selected the five-percent random sample.  A.R.S. § 19-121.04(A).  The Secretary then subtracts signatures disqualified by the county recorders.  A.R.S. § 12-121.04(A)(2).[4]  From the remaining eligible

---

[2]    On May 27, 2008, the statutory period was extended from ten to fifteen days.  2008 Ariz. Sess. Laws, ch. 244, § 4 (2d Reg. Sess.).  *See supra* note 1.

[3]    The statutory period was extended from forty-eight to seventy-two hours on May 27, 2008.  2008 Ariz. Sess. Laws, ch. 244, § 5 (2d Reg. Sess.).  *See supra* note 1.

[4]    Section 19-121.04(A)(1) allows the Secretary also to subtract from the total computed under § 19-121.01(A)(6) signatures on petitions containing a defective circulator's affidavit.  The Secretary, however, is required under § 19-121.01(A)(1)(d)-(f) to remove petitions with defective affidavits before computing the § 19-121.01(A)(6) base number. Moreover, the review by the county recorders does not involve circulators' affidavits, as the recorders receive only facsimiles of the fronts of the signature sheets under § 19-

5

signatures, the Secretary subtracts a "like percentage" of the signatures disqualified in the random sample.  A.R.S. § 19-121.04(A)(3).

¶9      If the remaining number of signatures is greater than one hundred five percent of the constitutional minimum, the Secretary notifies the applicant and Governor that the initiative should be placed on the ballot.  A.R.S. § 19-121.04(B).  If the remaining number is less than ninety-five percent of the minimum, the Secretary returns the original signature sheets and notifies the applicant that there are insufficient signatures.  A.R.S. § 19-121.04(D).  If the number falls between ninety-five and one hundred five percent, the Secretary orders the county recorders to examine and verify each signature filed to determine whether the number required by the constitution has been submitted.  A.R.S. § 19-121.04(C).

_____
121.01(C), and the circulators' affidavits are on the backs of the sheets.

        It appears that § 19-121.04(A)(1) is a remnant of a previous legislative scheme.  Until 1999, the Secretary of State was also required to reproduce a facsimile of the circulator's affidavit for every petition sheet not removed by the Secretary, A.R.S. § 19-121.01(C) (Supp. 1998); county recorders then determined whether affidavits would be disqualified, A.R.S. § 19-121.02(A)(10), (B) (Supp. 1998).  The legislature amended the statute in 1999 to relieve the county recorders of the duty of verifying circulators' affidavits and accordingly also removed the requirement that facsimiles of affidavits be transmitted.  1999 Ariz. Sess. Laws, ch. 353, §§ 5-6 (1st Reg. Sess.).

**B.**

¶10    On July 2, 2008, TIME filed signature sheets with the Secretary of State, who issued an "Initial Receipt" reflecting TIME's estimate of the number of sheets and signatures submitted. On July 24, 2008, the Secretary issued a second receipt stating that she had "completed her duties" under § 19-121.01(A) and accordingly had "filed a total of 19,945 petition signature sheets containing 238,874 signatures." The Secretary listed the reasons for the removal of various sheets and signatures submitted by TIME. *See* A.R.S. § 19-122(A) (requiring the Secretary to provide the initiative sponsor "with a written statement" for actions undertaken in the § 19-121.01 review process). The Secretary then created a five-percent sample of the remaining 238,874 signatures — 11,944 signatures — and sent facsimiles of the sheets containing these signatures to the county recorders for verification. The county recorders then disqualified 5,021 signatures, or 42.04 percent of the sample. The bulk of the disqualifications came from Maricopa County; that county's recorder received 10,445 of the signatures in the sample and disqualified 4,712.

¶11    On August 11, 2008, the Secretary notified TIME that after applying the recorders' error rate to the 238,874 signatures that she had previously determined were eligible for verification, the number of valid signatures projected from the

random sample was 138,451.  The constitutional minimum for an initiative proposing legislation was 153,365 signatures. Ninety-five percent of this number is 145,697.  Because TIME had submitted only 90.28 percent of the constitutional minimum, the Secretary concluded that the petition should not be placed on the ballot.  *See* A.R.S. § 19-121.04(D).

## C.

¶12      On August 13, 2008, TIME filed a complaint in Maricopa County Superior Court against the Secretary of State and the Maricopa County Recorder.  The complaint alleged that (1) the Secretary had improperly removed 9,168 signatures before creating the sample and (2) the Maricopa County Recorder had improperly disqualified 429 signatures in the random sample. TIME asked that these signatures be added to the base number of qualified signatures.  TIME also requested that the overall error rate be adjusted in light of the signatures allegedly improperly disqualified by the Maricopa County Recorder.

¶13      TIME contended that if its requested adjustments were made, the valid number of signatures submitted would be at least ninety-five percent of the constitutional minimum.  Because the Maricopa County Recorder had previously indicated that she could not verify all the signatures submitted for another initiative

8

before early voting began,[5] TIME asked that its initiative be placed on the ballot without a verification of each signature filed. *See Save Our Pub. Lands Coalition v. Stover*, 135 Ariz. 461, 464, 662 P.2d 136, 139 (1983) (holding that if county recorders are unable to verify before the ballot printing deadline each signature of a petition for which the random sample produces a certification rate between ninety-five and one hundred five percent, the initiative should be placed on the ballot).

**D.**

¶14      On August 19, 2008, the Secretary of State moved to dismiss the claims against her. She argued that under A.R.S. § 19-122(A), TIME was required to challenge her removal of petition sheets and signatures within ten days of her July 24, 2008 letter. The superior court granted the motion to dismiss and on August 21, 2008, entered a judgment pursuant to Arizona Rule of Civil Procedure 54(b) in favor of the Secretary; the claims against the Maricopa County Recorder remained.

---

[5]      Pursuant to A.R.S. § 19-121.04(C), the Secretary had ordered county recorders to verify each signature submitted in support of the "Protect Our Homes" initiative, for which the random sample had projected a valid signature rate between ninety-five and one hundred five percent. On August 4, 2008, the Maricopa County Recorder notified the Secretary of State that she could not complete this verification before early voting was scheduled to begin.

9

¶15     On the following day, August 22, TIME filed a notice of appeal pursuant to ARCAP 8.1(c).  This Court held a scheduling conference on the same day pursuant to ARCAP 8.1(f) and was informed by elections officials that to comply with statutory deadlines governing early balloting, the general election ballot needed to be submitted to the printer by the close of business on August 26 and finalized by August 28.  *See* 2008 Ariz. Sess. Laws, ch. 273, § 16 (2d Reg. Sess.) (amending A.R.S. § 16-545(B)) (requiring delivery of early ballots to the recorder no later than the thirty-third day before the election); *id.* § 14 (amending A.R.S. § 16-542(C)) (requiring mailing of early ballots within five days after receipt by recorder).[6]  With the concurrence of the parties, the Court ordered that simultaneous briefs be filed on August 25, 2008, in order that a decision could be reached on the following day.  No party requested oral argument.

¶16     We issued an order affirming the judgment of the superior court on August 26, 2008, noting that an opinion would follow.  This is that opinion.

---

[6]     These statutory amendments were precleared by the Department of Justice on September 2, 2008.  The previous versions of the two statutes were functionally the same.  *See* A.R.S. § 16-545(B) (2006) (requiring ballots to be delivered to recorders by the thirtieth day preceding the Saturday before the election); A.R.S. § 16-542(C) (requiring the recorders to mail the ballots within five days of receipt).

¶17     Chapter 1 of Title 19, which governs initiative and referendum petitions, contains several provisions allowing for judicial review of decisions by election officials and setting deadlines for bringing suit. County recorders' actions are reviewed under A.R.S. § 19-121.03. Subsection (A) governs claims that a recorder has failed or refused to comply with § 19-121.02; suit must be brought within ten days after the failure or refusal. A.R.S. § 19-121.03(A). Subsection (B) governs challenges to a recorder's certification of the number of valid signatures in the random sample. Suit must be brought within ten days of the receipt of the certification by the Secretary of State. A.R.S. § 19-121.03(B).

¶18     Section 19-122 governs challenges to actions of the Secretary of State. Subsection (C) allows a suit to enjoin the Secretary from certifying an initiative measure to the ballot if the "petition filed is not legally sufficient." A.R.S. § 19-122(C). Subsection (C) contains no time limitation, but we have held that any suit under this provision "must be initiated and heard in time to prepare the ballots for absentee voting to avoid rendering an action moot." *Kromko v. Superior Court*, 168 Ariz. 51, 57, 811 P.2d 12, 18 (1991).

¶19     By their terms, neither § 19-121.03 nor § 19-122(C) applies to TIME's claims against the Secretary of State. The

only other judicial review provision in Chapter 1 is A.R.S. § 19-122(A). That statute provides in relevant part as follows:

> If the secretary of state refuses to accept and file a petition for the initiative . . . which has been presented within the time prescribed, or if he refuses to transmit the facsimiles of a signature sheet or sheets or affidavits of circulators to the county recorders for certification under § 19-121.01, he shall provide the person who submitted the petition, proposal, signature sheet or affidavit with a written statement of the reason for the refusal. Within ten calendar days after the refusal any citizen may apply to the superior court for a writ of mandamus to compel the secretary of state to file the petition or proposal or transmit the facsimiles . . . .[7]

¶20     The superior court held that § 19-122(A) governs TIME's claims against the Secretary. The Secretary of State provided TIME with written reasons for her disqualification of certain signature sheets and signatures on July 24, 2008; TIME did not commence this suit until August 13. Therefore, if § 19-122(A) governs TIME's claims against the Secretary, the superior court correctly dismissed those claims as untimely.

**A.**

¶21     TIME first argues that its complaint is not governed by § 19-122(A) because it attacks the Secretary's ultimate certification pursuant to § 19-121.04(D) that the initiative lacked sufficient signatures to be placed on the ballot. That

---

[7]     The references in § 19-122(A) to affidavits of circulators are apparently a historical anomaly, as the Secretary now has no duty under § 19-121.01 to transmit facsimiles of these affidavits to the county recorders. *See supra* note 4.

certification was not made until after the county recorders completed their work under § 19-121.02 and thus could not have been challenged within the ten-day period specified in § 19-122(A), which began to run on July 24, 2008, the day the Secretary notified TIME of her reasons for rejecting various signature sheets and signatures.

¶22    We need not tarry over this argument. The Secretary's ultimate certification under § 19-121.04 as to the results of the screening process is a purely mathematical calculation – the Secretary starts with the base number of signatures submitted (as previously determined by the Secretary under § 19-121.01(A)(6)) and then subtracts signatures disqualified by the county recorders and a "like percentage" of the signatures disqualified in the sample. The Secretary then compares the resulting number to the constitutional minimum to qualify for the ballot. TIME did not allege that the Secretary made any mathematical errors in the § 19-121.04 calculations, but rather that the numbers used in that calculation resulted from prior errors in the review processes conducted by the Secretary under § 19-121.01 and the Maricopa County Recorder under § 19-121.02.

¶23    Moreover, TIME's argument proves too much. Challenges to a recorder's certification are governed by § 19-121.03(B). A challenger cannot avoid the time limitation in § 19-121.03(B) by claiming that the Secretary's ultimate calculations under § 19-

13

121.04 were based on an improper certification by a county recorder. *See Open Primary Elections Now v. Bayless*, 193 Ariz. 43, 46 ¶ 10, 969 P.2d 649, 652 (1998). Similarly, if § 19-122(A) governs TIME's challenges to the Secretary's determinations under § 19-121.01, the time limitations of that statute cannot be circumvented by describing a suit as a challenge to the ultimate § 19-121.04 calculations. Thus, we must move to the central question in this case: Does § 19-122(A) apply to TIME's suit against the Secretary?

## B.

¶24      TIME suggests that this Court adopt a "narrow reading" of § 19-122(A) and hold that the statute does not apply to all decisions made by the Secretary under § 19-121.01, but rather only to refusals to accept and file an entire initiative petition or to transmit to the county recorders facsimiles created by the Secretary under § 19-121.01(C). The Secretary argues that because TIME is challenging her removal of signature sheets and signatures, it is necessarily contending that she should have accepted these sheets and signatures for filing and sent additional signatures and facsimiles to the county recorders for verification. The Secretary contends that § 19-122(A) therefore applies.

¶25      TIME grounds its argument in a parsing of § 19-122(A), which refers to the failure of the Secretary "to transmit the

14

facsimiles of a signature sheet or sheets . . . to the county recorders for certification," not to the failure of the Secretary to create facsimiles in the first place. TIME's reading of the statute is not without some technical linguistic appeal. But, as TIME concedes, its interpretation of § 19-122(A) creates a wide gap in the judicial review provisions of Title 19, Chapter 1. No statute in that chapter other than § 19-122(A) purports to allow judicial review of the decisions of the Secretary today challenged by TIME. Under TIME's reading, the initiative statutes would contain no provision for judicial review of either the Secretary's decision to disqualify sheets and signatures under § 19-121.01 or the Secretary's consequent failure to create a sufficiently large random sample for recorder review.

¶26    We confronted a similar issue in *Pointe Resorts, Inc. v. Culbertson*, 158 Ariz. 137, 761 P.2d 1041 (1988). In that case, a city clerk determined that the proponents of a referendum challenging a municipal ordinance had submitted an insufficient number of valid signatures. *Id.* at 139, 761 P.2d at 1043. The plaintiff challenged that certification; the issue was whether that challenge was governed by the ten-day limitation in § 19-121.03(B).

¶27    The challenger in *Pointe Resorts* relied on the language of § 19-121.03(B), which on its face applied only to

15

"the certification made by the county recorder." *Id.* at 143, 761 P.2d at 1047. We rejected that claim in part because the "statute and its provisions must of necessity apply here or there is no machinery by which the courts could review the clerk's actions at all." *Id.* at 143-44, 761 P.2d at 1047-48. We refused to countenance such a "nonsensical" result. *Id.* at 143, 761 P.2d at 1047.

¶28 In *Kromko v. Superior Court*, we addressed an analogous argument. Relying on legislative history, the proponent of an initiative argued that § 19-122(C) requires that challenges to the Secretary's decision to place a measure on the ballot be filed within the same ten-day period as challenges under § 19-122(A). *Kromko*, 168 Ariz. at 55, 811 P.2d at 16. We noted, however, that such a reading would deprive challengers of any statutory avenue for review of the Secretary's decision to place on the ballot a petition initially accepted subject to verification under §§ 19-121.01 and 19-121.02. *Id.* at 56, 811 P.2d at 17. We refused to interpret the statutes in a manner that would deprive citizens of "the means and opportunity" to challenge the Secretary's actions. *Id.*

¶29 Similar concerns guide us here. Given the importance of the initiative process, it is extremely unlikely that the legislature would provide in § 19-122(A) a prompt remedy for the Secretary's failure to transmit a single facsimile sheet as

required by § 19-121.01, but provide no remedy at all for the improper disqualification under the same statute of hundreds of signature sheets. Nor do we believe that the legislature intended that § 19-122(A) require a prompt challenge to the Secretary's decision to reject an entire petition because of defects in a sufficient number of circulators' affidavits, but not govern judicial review of the Secretary's decision to disqualify a lesser number of sheets (but not enough to require rejection of the petition) on identical grounds. *Cf. Harris v. City of Bisbee*, 219 Ariz. 36, 39 ¶¶ 9-12, 192 P.3d 162, 165 (App. 2008) (holding that § 19-122(A) governs action attacking town clerk's invalidation of signature sheets and consequent refusal to forward petitions to county recorder for verification under § 19-121.01(B)-(C)).

¶30 We decline to conclude that Title 19 contains "no machinery . . . by which the courts could review the [election official's] actions." *Kromko*, 168 Ariz. at 55, 811 P.2d at 16. Rather, the most reasonable interpretation of § 19-122(A) is that it applies to challenges to the Secretary's actions under § 19-121.01, including the disqualification of signature sheets and signatures, and that the ten-day limitation period begins to run when the Secretary issues her written statement explaining her reasons for rejecting signature sheets and signatures.

17

## C.

¶31    TIME argues that if § 19-122(A) is interpreted as inapplicable to challenges such as the one before us, judicial review of the Secretary's § 19-121.01 disqualification of signature sheets and signatures remains available under the general mandamus statute, A.R.S. § 12-2021 (2003).  That provision authorizes actions "to compel . . . performance of an act which the law specially imposes as a duty resulting from an office."

¶32    As an initial matter, we note that TIME's claims against the Secretary do not clearly fall within that statute. We have described mandamus as available only "to require public officers to perform their official duties when they refuse to act." *Sears v. Hull*, 192 Ariz. 65, 68 ¶ 11, 961 P.2d 1013, 1016 (1998) (quoting *Smoker v. Bolin*, 85 Ariz. 171, 173, 333 P.2d 977, 978 (1958)).  In this case, TIME's claim is not that the Secretary refused to perform her statutory duties under § 19-121.01(A) but rather that she erred in performing them.

¶33    But even if this problem is overlooked, a serious one remains.  Although our statutes do not expressly limit the time within which mandamus and other extraordinary forms of relief may be sought, we have long emphasized that a party may not unreasonably delay in bringing such actions.  *See, e.g., Felix v. Superior Court*, 92 Ariz. 247, 250, 375 P.2d 730, 732 (1962).

18

Consequently, we have denied special action relief in election cases when delay in filing an action is unreasonable. *Sotomayor v. Burns*, 199 Ariz. 81, 83 ¶ 8, 13 P.3d 1198, 1200 (2000).

¶34    In the case before us, TIME was aware of the Secretary's reasoning for the § 19-121.01(A) disqualifications by July 24, yet did not file suit until August 13, after the county recorders had completed their § 19-121.02 certifications. Under the statutory scheme, if the Secretary indeed erred in some or all of her § 19-121.01(A) disqualifications, TIME would only be entitled to two remedies:  (1) correction of the Secretary's initial determination under § 19-121.01(A)(6) of the number of signatures "eligible for verification" and (2) a consequent increase in the number of signatures (and facsimiles) included in the sample and forwarded to the county recorders for verification.  By delaying its action until after the recorder verification process was completed, TIME at the very least made difficult – and perhaps impossible – any remedy involving further preparation of additional facsimiles by the Secretary and review of randomly chosen signatures by the county recorders.  And, even assuming that such a process could have been completed before the deadline for printing ballots, it seems clear that effective judicial review of the recorders' verifications – either at the trial or appellate level – simply could not have occurred. *See Harris v. Purcell*, 193 Ariz. 409,

412-13 ¶ 17, 973 P.2d 1166, 1169-70 (1998) (noting that "[t]o wait until the last moment [to challenge an election matter] places the court in a position of having to steamroll through the delicate legal issues in order to meet the deadline for measures to be placed on the ballot") (alterations in original).

¶35    Thus, if we were to accept TIME's argument that mandamus is the appropriate method for addressing its claims against the Secretary, we would be required in virtually every case to determine whether such claims were unreasonably delayed. In contrast, § 19-122(A) expressly contemplates that suit be brought at a time when, if the challenge is successful, the superior court can order the Secretary to forward additional facsimiles to the recorders for verification.   There is no significant harm to initiative sponsors in requiring that all challenges to the Secretary's § 19-121.01 determinations be brought within ten days after notice of the reasons for such actions is issued.[8]  The most reasonable reading of the statutory

---

[8]    TIME argues that challengers will face additional expense if forced first to challenge the Secretary's decisions under § 19-122(A) and then later to challenge the recorders' certifications under § 19-121.03(B).  It is not apparent to us that significant extra expense will thereby be incurred, as challengers in TIME's position will be required in the end to prove their claims against both the Secretary and the recorders. Moreover, even under TIME's "narrow" interpretation of § 19-122(A), two separate suits would be required if the Secretary improperly failed to transmit a specific facsimile sheet or rejected an entire petition.

scheme is that claims that the Secretary erred in the execution of her § 19-121.01 duties are governed by § 19-122(A), not the general mandamus statute.

## III.

¶36    For the reasons stated above, we hold that the superior court correctly dismissed TIME's claims against the Secretary as time-barred under § 19-122(A).[9]

¶37    It is appropriate to add an additional word. We respectfully suggest that Title 19 deserves a thorough legislative reexamination. Even when, as here, election officials act promptly and both sides are represented by extraordinarily able counsel, the entire statutory scheme no longer can always be followed. Even in a case not involving litigation, the Maricopa County Recorder has candidly

---

[9]    Although TIME remained free under the superior court's Rule 54(b) judgment to pursue its separate claims against the Maricopa County Recorder, it did not do so before the deadline for printing early ballots.

Without success in at least some of TIME's claims against the Recorder, even complete success against the Secretary would not have resulted in placement of the initiative on the ballot. TIME's complaint alleged that the Secretary had improperly disqualified 9,168 signatures. Assuming that TIME would have succeeded in establishing that each signature was improperly disqualified, the resulting number of signatures eligible for verification under § 19-121.01(A)(6) would have increased to 248,042. But if the statewide error rate from the random sample remained at 42.04 percent, this increased base number would result in only 143,765 valid signatures, 93.74 percent of the constitutional minimum.

21

acknowledged that she is unable to complete the signature-by-signature verification process required by A.R.S. § 19-121.04(C) in a timely fashion. *See supra* note 5 and accompanying text. This is not a new problem; we confronted it more than a quarter of a century ago in *Save Our Public Lands Coalition*, and concluded that when an initiative is denied its statutory entitlement to such review, the appropriate relief is to order placement of the measure on the ballot. 135 Ariz. at 464, 662 P.2d at 139.

¶38 But whatever the practical necessity of that decision, it would clearly be preferable for the legislature to modify the statutory scheme in light of today's realities to avoid such structural problems. Our election officials are required to process large numbers of initiative and referendum petitions. The growth of the state's electorate means that the number of signatures submitted in order to qualify for placement on the ballot has also steadily grown. And, even when the Secretary and county recorders complete the verification process within the statutory deadlines, the time for judicial review has been shortened by the need to prepare ballots for early voting.

¶39 It is, of course, not within our constitutional assignment to suggest specific legislative solutions to this problem. And, if no change is made in the qualification process, the judiciary will continue to decide election cases

22

with all appropriate celerity.  But it is not, we think, beyond our role to suggest that there may be a better way, and to encourage the other branches of government to consider that issue.


_____
                Andrew D. Hurwitz, Justice


CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
W. Scott Bales, Justice