IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

WORKERS FOR RESPONSIBLE DEVELOPMENT, et al.,
*Plaintiffs/Appellants/Cross-Appellees*,

v.

CITY OF TEMPE, et al.,
*Defendants/Appellees/Cross-Appellants*,

and

SOUTH PIER TEMPE HOLDINGS LLC,
*Real Party in Interest-Appellee.*

No. 1 CA-CV 22-0395 EL

FILED 1-26-2023

Appeal from the Superior Court in Maricopa County
No.  CV2022-003530
The Honorable John R. Hannah, Judge

**AFFIRMED IN PART AND REVERSED IN PART**

COUNSEL

Barton Mendoza Soto, PLLC, Tempe
By James E. Barton, II, Jacqueline Soto
*Counsel for Plaintiffs/Appellants/Cross-Appellees*

Tempe City Attorney's Office, Tempe
By Sonia M. Blain, Michael R. Niederbaumer, Sarah R. Anchors
*Counsel for Defendants/Appellees/Cross-Appellants*

Gammage & Burnham, PLC, Phoenix
By Cameron C. Artigue, Camila Alarcon
*Counsel for Real Party in Interest-Appellee*

Berry Riddell LLC, Scottsdale
By Jeffrey D. Gross
*Counsel for Amicus Curiae*

---

## OPINION

Judge James B. Morse Jr. delivered the opinion of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Michael J. Brown joined.

---

**M O R S E**, Judge:

**¶1**         Workers for Responsible Development and Joshua Wells (collectively "Workers") appeal the superior court's ruling that their referendum petition did not strictly comply with statutory requirements. The City of Tempe ("City") and Carla Reece ("City Clerk") cross-appeal the court's ruling that City Ordinance No. O2022.06 ("Ordinance") is subject to referendum. South Pier Tempe Holdings LLC ("Developer"), the real-party-in-interest, defends the superior court's strict-compliance ruling. Because the referendum petition used by Workers contained all the statutorily required information, the superior court erred in finding that the document did not strictly comply. But the court correctly determined that the Ordinance was referable because it decided and implemented extensive tax, expenditure, sale, and development policies.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**         The City Council passed and adopted the Ordinance on February 10, 2022. The Ordinance authorized the City's mayor to execute a Development and Disposition Agreement ("Development Agreement") with Developer. The Development Agreement concerned twelve-and-a-half acres of City-owned land near Tempe Town Lake that included a phased sale of the property, Government Property Lease Excise Tax

("GPLET") leases, a Conceptual Development Plan ("CDP"), the City's required approval of a Planned Area Development ("PAD"), Construction Sales Tax Rebates, Parcel Development Agreements ("PDA") subordinate to the Development Agreement, "Public Financing Opportunities," and other documents related to the Ordinance.

¶3　　　　The City Clerk provided Workers with a copy of the Ordinance on February 15, 2022, as required by A.R.S. § 19-142(C). Workers sought to challenge the Ordinance via referendum and the City Clerk provided Workers a referendum-petition form developed by the City.

¶4　　　　Workers timely tried to file their referendum petition, but the City Clerk refused to accept it. Later, the City provided Workers with a written statement formally rejecting the referendum petition by asserting that the City Council's approval of the Ordinance constituted a non-referable administrative act because the Ordinance dealt with specific parcels of land and neither related to "any amendments to the City's codes" nor any "policy creation or implementation."

¶5　　　　Workers timely challenged the City's rejection in the superior court. Workers sought (1) a writ of mandamus to compel the City Clerk to file and process its referendum petition, and (2) permanent and preliminary injunctions to prohibit the Ordinance from taking effect. The court concluded that the Ordinance and the Development Agreement together constituted a legislative act subject to referendum but concluded that Workers' petition form was invalid because it did not strictly comply with the "required order" for referenda forms under A.R.S. § 19-101(A). Accordingly, the court denied Workers' application for a preliminary injunction and declined to compel the City Clerk to process Workers' referendum petition.

¶6　　　　Workers timely appealed and the City cross-appealed. As the real-party-in-interest on appeal, Developer defends the superior court's strict-compliance ruling. We have jurisdiction under A.R.S. §§ 12-120.21(A)(1), -2101(A), and 19-122(A). *See Perini Land & Dev. Co. v. Pima County*, 170 Ariz. 380, 382 (1992) (instructing parties to file referendum appeals in the court of appeals).

## DISCUSSION

¶7　　　　The Arizona Constitution reserves the power of referendum to the qualified electors of incorporated cities. Ariz. Const. art. 4, pt. 1, § 1(8). The referendum power "permits qualified electors to circulate petitions and refer legislation which has been enacted by their elected

representatives to a popular vote." *Redelsperger v. City of Avondale*, 207 Ariz. 430, 432, ¶ 8 (App. 2004).

**¶8** We review a trial court's decision on a request for injunctive relief for an abuse of discretion. *Parker v. City of Tucson*, 233 Ariz. 422, 428, ¶ 11 (App. 2013). But we review questions of law and the interpretation of election statutes de novo. *Arrett v. Bower*, 237 Ariz. 74, 77, ¶ 7 (App. 2015); *Redelsperger*, 207 Ariz. at 432, ¶ 7.

**¶9** On appeal, the parties dispute whether (1) Workers' referendum petition form strictly complied with A.R.S. § 19-101(A); and (2) the Ordinance is subject to referendum. We address each in turn.

## I.    Strict Compliance

**¶10** The statute provides, in relevant part, that the "following shall be the form for referring to the people by referendum petition" and lists the "Referendum Description" before the "Petition for Referendum." A.R.S. § 19-101(A). As noted above, Workers employed a petition form provided by the City Clerk. Using that form, Workers circulated petitions that listed the "Petition for Referendum" first, followed by the "Referendum description," as follows:

**Petition for Referendum** To the Clerk: We, the undersigned citizens and qualified electors of the state of Arizona, respectfully order that local measure No. [O2022.06] entitled [Ordinance No. O2022.06] (title of act or ordinance, and if the petition is against less than the whole act or ordinance then set forth here, the item, section, or part, of any measure on which the referendum is used), passed by the [Tempe] (city or town) Council shall be referred to a vote of the qualified electors of the city or town for their approval or rejection at the next regular general election (or city or town election) and each for himself says: I have personally signed this petition with my first and last names. I have not signed any other petition for the same measure. I am a qualified elector of the state of Arizona, city or town of [Tempe] .

Referendum description: Insert a description of not more than 200 words of the principal provisions of the proposed measure sought to be referred. **Notice**: This is only a description of the measure sought to be referred prepared by the sponsor of the measure. It may not include every provision contained in the measure. Before signing, make sure the title and text of the measure are attached. You have the right to read or examine the title and text before signing.

An ordinance of the city council of the City of Tempe authorizing the mayor to execute a development and disposition agreement with South Pier Tempe Holdings LLC, for the project located at 1131 East Vista del Lago Drive, Tempe, AZ and related documents necessary to the project. Key project components of the Project include Class A office, for rent apartments and for sale condos, destination retail, a hotel, Central green and plaza areas for pedestrian gathering, resort inspired landscaping and an enhanced levee trail where multipurpose path is located to activate that outdoor area, and the first phase of pedestrian bridge on eastern end of the Project with an attached pier and an observation wheel. Developer intends to purchase the property for $74.02 per square foot. Upon completion of first improvement on each parcel, the Developer will complete the purchase of that parcel and receive a Government Property Lease Excise Tax lease allowing for 8 years of tax abatement. Developer will provide certain public benefits including $12,680,688 with 80% allocated to Tempe Coalition for Affordable Housing and 20% to Tempe Transit Fund, and other cash contributions as certain construction phases are completed. Developer will commence construction in January 31, 2023.

**¶11** Developer argues that Workers' form fails to comply strictly with A.R.S. § 19-101(A). But other than the inverted order of the "Referendum description" and "Petition for Referendum," the parties do not dispute that the petition complies with A.R.S. § 19-101(A).

4

¶12          Workers argue that the petition form strictly complied with A.R.S. § 19-101(A) despite the reversed order of the "Referendum description" and the "Petition for Referendum."  We agree.

¶13          "Statutory interpretation requires us to determine the meaning of the words the legislature chose to use.  We do so . . . according to the plain meaning of the words in their broader statutory context . . . ." *S. Ariz. Home Builders Ass'n v. Town of Marana*, --- Ariz. ---, ---, ¶ 31 (Jan. 17, 2023).  The statute provides that the "statutory requirements for the referendum be strictly construed and that persons using the referendum process strictly comply with those constitutional and statutory requirements."  A.R.S. § 19-101.01; *see also Comm. for Pres. of Established Neighborhoods v. Riffel*, 213 Ariz. 247, 249, ¶ 6 (App. 2006) (noting strict compliance "requires nearly perfect compliance").  Although the legislature added A.R.S. § 19-101.01 in 2015, Developer acknowledges that strict compliance for referenda pre-dates the current statute and has been the standard in Arizona for quite some time.  *See Cottonwood Dev. v. Foothills Area Coal. of Tucson, Inc.*, 134 Ariz. 46, 49 (1982) (stating that referenda are subject to strict compliance with statutory and constitutional requirements (citing *Direct Sellers Ass'n v. McBrayer*, 109 Ariz. 3, 5-6 (1972))).

¶14          "If the statute has only one reasonable meaning when considered in context, we apply that meaning without further analysis.  If the statute has more than one reasonable meaning, we apply secondary interpretive principles, including considering the statute's subject matter and purpose, to identify legislative intent."  *Leibsohn v. Hobbs*, 254 Ariz. 1, 4, ¶ 10 (2022) (internal citations omitted).

### A.     Meaning of "Form"

¶15          Arizona statutes have long provided for the use of a standard form for referenda.  *E.g.*, 1912 Ariz. Sess. Laws, ch. 71, § 1 (1st Spec. Sess.) ("The following shall be substantially the form of petition for referring to the people by referendum petition . . . ."); A.R.S. § 19-101 (1979) ("The following shall be the form for referring to the people by referendum petition . . . ."); A.R.S. § 19-101 (1991) ("The following shall be the form for referring to the people by referendum petition . . . .").

¶16          The parties dispute whether the statute's prescription for the "form" of referendum petitions dictates both the content of the petition and the order in which that content is provided.  Workers argue "form" relates to the "proper contents, not the proper order of words," while Developer argues "form" means "the order in which the information appears."  At oral

argument, Developer acknowledged that resolving strict-compliance hinges on interpreting the meaning of "form." On this point, Developer argued that dictionary definitions of "form" connote organization and structure, and not just a list of items.

¶17    Dictionaries provide multiple definitions of the word "form." *See State v. Wise*, 137 Ariz. 468, 470 n.3 (1983) (explaining courts may reference dictionaries to glean the ordinary meaning of words); *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 526 (2009) (interpreting a statute based on the understanding of terms at the time of enactment). Notably, Black's Law Dictionary provided an essentially identical definition of "form" from the time of Arizona's statehood through 1990. *See Form*, Black's Law Dictionary (2d ed. 1910); *Form*, Black's Law Dictionary (4th ed. 1951); *Form*, Black's Law Dictionary (5th ed. 1979); *Form*, Black's Law Dictionary (6th ed. 1990); *see also State ex rel. Brnovich v. Ariz. Bd. of Regents*, 250 Ariz. 127, 131-32, ¶ 15 (2022) (citing, with approval, the use of Black's Law Dictionary definitions to interpret statutes). From 1910 to 1990, Black's defined "form" as a "model or skeleton of an instrument to be used in a judicial proceeding or legal transaction, containing the principal necessary matters, . . . arranged in proper and methodical order, *and* capable of being adapted to the circumstances of the specific case." *E.g.*, *Form*, Black's Law Dictionary (6th ed. 1990) (emphasis added). This definition provides support for Developer, insofar as "form" contemplates a "proper and methodical order" in which information is presented, but also supports Workers in that a "form" is "capable of being adapted" and, thus, not necessarily fixed. *Id.*

¶18    Other dictionaries do not provide greater clarity or mandate a contrary conclusion. For example, one early dictionary includes multiple definitions of "form" as a noun:

> the external appearance or shape of anything; image; likeness; orderly arrangement; beauty; symmetry; determinate shape or structure; established practice, or ritual; a mold or pattern; an official formula; a long bench without a back; a class; state or high condition or fitness; the bed or seat of a hare; types, places, &c., imposed in a chase ready for printing (forme) . . . .

*Form*, New Websterian Dictionary (1912); *see also Matthews v. Indus. Comm'n*, --- Ariz. ---, ---, ¶ 36, 520 P.3d 168, 175, ¶ 36 (2022) (describing the New Websterian Dictionary (1912) as an "authoritative dictionary published at the time our constitution was adopted"). The most helpful definitions for Developer are "orderly arrangement" and "determinate

shape or structure."  But those definitions do not negate "likeness" as another definition of "form."  And "likeness" can be defined as "similarity." *Likeness*, New Websterian Dictionary (1912); *see also Similarity*, New Websterian Dictionary (1912) (defining "similarity" as "resemblance").  By changing the order of the required information, Workers may not have precisely mirrored the "orderly arrangement" or "determinate . . . structure" described in A.R.S. § 19-101(A), but one cannot say that there is not a "likeness" (similarity/resemblance) between Workers' document and the example provided in the statute.

¶19        Another more-recent dictionary provides 25 separate definitions and subdefinitions of "form" as a noun.  *Form*, Webster's New Collegiate Dictionary (9th ed. 1984).  Those definitions include (2) "the essential nature of a thing as distinguished from its matter," (3)(b) "a prescribed and set order of words," and (4) "a printed or typed document with blank spaces for insertion of required or requested information . . . ." *Id.*  The former is arguably consistent with Workers' position, i.e., emphasizing the contents and not necessarily the order of the words.  But the latter two definitions support Developer's argument, i.e., that the order of the content is important.

¶20        Rather than trying to select from among these competing dictionary definitions, we must acknowledge that "form" is ambiguous, and look for guidance in statutory interpretation principles.  *See Leibsohn*, 254 Ariz. at 4, ¶ 10; *Fann v. State*, 251 Ariz. 425, 434, ¶¶ 26-27 (2021) (interpreting a statutory phrase based on context after noting competing dictionary definitions of "grant"); *see also Wilks v. Manobianco*, 237 Ariz. 443, 446, ¶ 8 (2015) ("[I]f the language is ambiguous, we look to the statute's history, context, consequences, and purpose.").

¶21        In this case, two interpretive principles are both instructive and dispositive.  First, absent a clear contrary indication, we presume that words or phrases bear the same meaning throughout a text.  *See Fann*, 251 Ariz. at 442, ¶¶ 60-61.  And, second, "when the legislature uses different language within a statutory scheme, it does so with the intent of ascribing different meanings and consequences to that language." *Riffel*, 213 Ariz. at 249-50, ¶ 8.

¶22        *Van Riper v. Threadgill*, 183 Ariz. 580 (App. 1995), is instructive.  There we found that a referendum petition with only ten signature lines strictly complied despite A.R.S. § 19-101(A)'s instruction that referenda forms contain "[f]ifteen lines for signatures which shall be numbered." *Id.* at 584.  In finding strict compliance, we looked to a related

election statute, A.R.S. § 19-121(C), which declares that "[n]ot more than fifteen signatures on one sheet shall be counted," and found that "the fifteen signature lines referred to in [A.R.S. § 19-101(A)] is a maximum rather than a minimum." *Van Riper*, 183 Ariz. at 584. During oral argument, Developer expressly declined to argue that *Van Riper* was wrongly decided and urged us to "harmonize" election statutes as in *Van Riper* to interpret A.R.S. § 19-101(A). Consistent with this approach, we look to other election statutes.

¶23 When the legislature intends to preclude changes to an election-related form, it has said so. Like A.R.S. § 19-101(A) does for referenda, A.R.S. § 19-204(G) provides a "form" to use for a recall petition affidavit. But A.R.S. § 19-204(H) explicitly provides that the "form of the affidavit shall not be modified," and any petition "contain[ing] a partially completed affidavit or an affidavit that has been modified is invalid."

¶24 Similarly, A.R.S. § 19-112(F) provides a "form" for initiative petition affidavits and provides that "[t]he form of the affidavit shall not be modified." And A.R.S. § 19-213 provides a "form" for recall ballots and provides that the "form of the ballot shall conform as nearly as practicable to the ballot prescribed for general elections." Even in the referenda context, the legislature has specified when an improperly completed form shall not count. *See* A.R.S. § 19-101(E) ("Signatures obtained on referendum petitions [that do not indicate whether the circulator is paid or a volunteer] are void and shall not be counted . . . ."). Because the legislature has shown that it knows how to prohibit changes to election forms, it is noteworthy that A.R.S. § 19-101(A) does not explicitly prohibit modification to the referendum "form." *See Riffel*, 213 Ariz. at 249-50, ¶ 8 (noting "that when the legislature uses different language within a statutory scheme, it does so with the intent of ascribing different meanings and consequences to that language").

¶25 Other election statutes also demonstrate that the legislature has specified the order in which information is presented when it desires to do so. Section 16-502, titled "Form and contents of ballot," provides for both the content of ballots and detailed instructions regarding the order in which information is presented: "ballots shall be headed 'official ballot' in bold-faced plain letters, with a heavy rule *above and below* the heading. *Immediately below* shall be placed the words 'type of election, (date of election)' and the name of the county and state in which the election is held." A.R.S. § 16-502(A) (emphasis added); *see also* A.R.S. § 19-123(A)(7) (requiring a notice to be placed "[i]mmediately below the legislative council analysis"); A.R.S. § 19-124(D) (providing that initiative arguments "shall be included in the publicity pamphlet immediately following the measure or

amendment to which they refer" and that affirmative arguments "shall be placed first in order"); A.R.S. § 19-125(D)-(F) (requiring that information shall be provided on initiative ballots "immediately below" or "immediately before" other information).

**¶26** Though A.R.S. § 19-101 provides a "form" that referendum petitions shall use, no statutory provision prohibits modifying the "form" as in §§ 19-112, -204, and -213. Similarly, unlike in A.R.S. §§ 16-502 and 19-123 to -125, nothing in A.R.S. § 19-101(A) specifies that text or information must be provided "above," "below," or "immediately below" other text. Because the legislature did not prohibit modification of the "form" for referenda, but did so for other election forms, we presume the legislature's choice is meaningful. *See Liebsohn*, 254 Ariz. at 5, ¶ 15 ("In short, the legislature knows how to specify when an address requires a unit number, and it did not do so in § 19-118(B)(1)."); *Riffel*, 213 Ariz. at 249-50, ¶ 8. And because the legislature did not prohibit modification of the "form" or otherwise specify that information in the form must immediately follow or precede other information, we cannot conclude that Workers' referendum petition failed to comply strictly with the statutory requirements. The reversed order of the "Referendum description" and the "Petition for Referendum" statement neither alters the petition's prescribed contents nor negates the presence of all statutory components under A.R.S. § 19-101. *See Jones v. Respect the Will of the People*, 254 Ariz. 73, 81, ¶ 29 (App. 2022) (declining "to conclude that the presence of any surplus information on a referendum petition automatically negates strict compliance under § 19-101(A)" as it "does not alter the meaning or cause confusion").

**¶27** Developer relies on *Riffel* to argue that the petition form does not strictly comply with A.R.S. § 19-101(A). In *Riffel*, we rejected a referendum petition that did not include the required description directly on the signature page of the petition. 213 Ariz. at 250-51, ¶¶ 13-14. Instead of including that "referendum description directly into the text of circulating petitions" as required by the statute, the referendum proponents had stapled a separate page containing the description to the petition form. *Id.* at 248, 250-51, ¶¶ 2, 14. We reasoned that the statute was designed to ensure that petition signers are provided with the required information directly on the signed petition document so that "circulators cannot abuse the referendum process by later removing the stapled description and attaching a different description to the signatures." *Id.* at 250, ¶¶ 10, 13. Because the petition did not include all the required information, we found that it did not strictly comply with A.R.S. § 19-101(A). *Id.* at 250-51, ¶ 14.

¶28         But here, the parties do not dispute that Workers included the required information on the petition form and both the petition and description appeared on the same page as the signature lines. Because the petition provided signers all the required information on one page, *Riffel* does not support Developer's argument. *See Sklar v. Town of Fountain Hills*, 220 Ariz. 449, 454, ¶ 17 (App. 2008) ("The purpose of [§ 19-101(A)] is to ensure that the public has immediate and full disclosure of the exact public action that may be reversed.").

¶29         Our holding is narrow. When read in context, the word "form" in A.R.S. § 19-101(A) does not mandate that the "Referendum Description" must always precede the "Petition for Referendum." Because Workers' petition includes all the statutorily required components on the same page, Workers' petition strictly complied with A.R.S. § 19-101(A).

### B.     Reliance and Constitutional Rights

¶30         Because we determine that Workers' petition strictly complied with A.R.S. § 19-101(A), we need not address whether Workers were entitled to rely on the City-provided form under A.R.S. § 19-102.01(B). *Cf. Leibsohn*, 254 Ariz. at 9, ¶ 32 (excusing noncompliance with A.R.S. § 19-118(B)(5) when the Secretary of State's procedures "made it impossible" to comply). Also, we need not address Workers' constitutional arguments about using the City's form. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992) (weighing the burden imposed on the party seeking to exercise their First Amendment rights against the state's interest that justifies the burden).

## II.    Referability

¶31         We reject the City's argument that the Ordinance is not subject to referendum. We review this matter de novo. *See Fritz v. City of Kingman*, 191 Ariz. 432, 433, ¶ 6 (1998) (reviewing de novo the trial court's determination that an ordinance was a legislative act subject to referendum).

### A.     Development Agreements

¶32         Both parties spend considerable effort addressing whether A.R.S. § 9-500.05 categorically subjects development agreements to referenda. While Workers make a persuasive argument that the legislature may have intended to subject development agreements to referenda through the thirty-day effective-date limitation in A.R.S. § 9-500.05(G), the statutory text does not go so far. And because this Development

Agreement is referrable under the analysis established in *Wennerstrom v. City of Mesa*, 169 Ariz. 485, 489 (1991), we need not decide any broader questions, *see Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 272 (1994) (noting it is "unwise" to speculate about legislative intent if an issue may be decided on other grounds).

## B.  The Legislative-Administrative-Act Distinction

**¶33**        The City Council authorized the City's mayor to execute the Development Agreement by ordinance.  *See* Charter of the City of Tempe art. II, § 2.11 (1968) (listing acts of the City Council that require an ordinance); *see also* A.R.S. § 9-500.05(A) (providing that municipalities may enter development agreements by resolution or ordinance).  And so we must examine the legislative-administrative-act distinction with regard to the Development Agreement.

**¶34**        A city council's legislative acts are subject to referenda, but its administrative acts are not referable.  *See* Ariz. Const. art. 4, pt. 1, § 1(8) (limiting the referendum power to those matters on which a governmental body is "empowered by general laws to legislate"); *Wennerstrom*, 169 Ariz. at 488-89.  Limiting referenda to legislative acts is necessary because permitting referenda on administrative acts "would hamper the efficient administration of local governments."  *Wennerstrom*, 169 Ariz. at 488; *Redelsperger*, 207 Ariz. at 432, ¶ 9.

**¶35**        Under Arizona law, "an act that declares a public purpose and provides for the ways and means of its accomplishment is legislative." *Wennerstrom*, 169 Ariz. at 489; *Pioneer Trust Co. of Ariz. v. Pima County*, 168 Ariz. 61, 65 (1991).  Legislative acts are "distinguished" from non-referrable administrative acts "which merely carr[y] out the policy or purpose already declared by the legislative body." *Wennerstrom*, 169 Ariz. at 489 (emphasis omitted) (quoting 5 Eugene McQuillin, *The Law of Municipal Corporations* § 16:53 (3d ed. 1989)).  "Under the *Wennerstrom* analysis, we must consider whether the action is (1) permanent or temporary, (2) of general or specific (limited) application, and (3) a matter of policy creation or a form of policy implementation." *Redelsperger*, 207 Ariz. at 433, ¶ 15 (citing *Wennerstrom*, 169 Ariz. at 489).

### 1.  Permanent

**¶36**        The Development Agreement is permanent in nature. *Wennerstrom*, 169 Ariz. at 489 (noting actions related to subjects of a permanent character are legislative).  The City argues that because the Development Agreement neither "rezone[s]" nor makes "a permanent

change to the property," the Ordinance is not legislative. But the City's argument ignores the delegation to the City's Director of Community Development to approve limited deviations from the Tempe Zoning Code. *Infra* ¶ 43.

¶37 In *Town of Florence v. Florence Copper Inc.*, 251 Ariz. 464, 468-69, ¶¶ 22-23 (App. 2021), we noted development agreements "are the product of legislative action," that have permanent characteristics, such as the "burdens and benefits" inuring to "successors in interest and assigns," that "cannot be amended or cancelled without mutual consent." Here, the burdens and benefits of the Development Agreement inure to successors and assigns, and are enforceable by Developer against the City. *See* Charter of the City of Tempe art. II, § 2.11 (1968); *Florence Copper Inc.*, 251 Ariz. at 469, ¶¶ 22-23. Because the Development Agreement provides Developer certainty, allows Developer to extend the 25-year Master Lease, provides for deviations from the City's Zoning and Development Code ("ZDC"), and restricts the property's land use based on its terms, the Development Agreement is permanent and definite.

## 2. General Application

¶38 "To constitute legislation, a proposal must enact something; it must be a 'definite, specific act or resolution.'" *Fritz*, 191 Ariz. at 434, ¶ 11 (citation omitted); *see McBride v. Kerby*, 32 Ariz. 515, 522 (1927) ("[L]egislatures do not enact general principles or subjects, nor indeed can they."). For example, adopting "specific ordinances" on "specific locations" can be legislative rather than administrative when a prior act neither commands "anything specific," which would require future legislative decisions to create new policy, nor provides the "ways and means of its own accomplishment." *Fritz*, 191 Ariz. at 434-35, ¶¶ 15-16.

¶39 We conclude that adopting the Development Agreement via the Ordinance was a general legislative act "that declares a public purpose and provides for the ways and means of its accomplishment." *Wennerstrom*, 169 Ariz. at 489. The Development Agreement's stated public purpose is to "improve or enhance the economic welfare of the inhabitants of the City" and the ways-and-means of carrying out that purpose are identified in the Ordinance and Development Agreement.

¶40 For example, the Ordinance specifies that (1) the property is "a master-planned real estate development" to be built in seven phases over 15 years; (2) "Developer intends to purchase the City Property in a phased manner" and the City Council approves the sale of the property to

Developer at an appraised value; (3) the "City will grant a Master Lease to give control to Developer without requirement to sell the property," but upon improving each parcel Developer "will complete the purchase of that parcel and receive a [GPLET] Lease" allowing for an eight-year tax abatement; and (4) Developer will provide public benefits to the City to include "cash contributions" of $12,680,688 allocating 80% to Tempe Coalition for Affordable Housing and 20% to the Tempe Transit Fund, along with cash contributions for a pedestrian bridge, the Tempe Education Foundations, and enhancements "to increase the public experience."

¶41            The Development Agreement further provides that "significant benefits" will accrue to the City from the development of the property, such as "increased tax revenues" and "the creation of jobs in the City." By approving the Development Agreement, the City Council mandated that each GPLET lease "must conform to the form" attached to the Development Agreement and that the "execution of a GPLET Lease is an administrative action in furtherance of this policy." The Development Agreement also includes the Master Lease that fills in the ways-and-means of accomplishing its purpose and can be extended beyond its 25-year term.

¶42            In addition to the GPLET leases, the Development Agreement includes a "Construction Sales Tax Rebate" clause allowing Developer to claim a sales tax rebate subject to a "notice of intent" adopted by the City Council under A.R.S. § 9-500.11. *See* A.R.S. § 9-500.11(K) ("A city or town shall adopt a notice of intent to enter into a retail development tax incentive agreement at least [14] days before approving a retail development tax incentive agreement."). "A decision by the governing body involving an expenditure" under A.R.S. § 9-500.11 "shall not be enacted as an emergency measure and that decision is not effective for at least [30] days after final approval of the expenditure." A.R.S. § 9-500.11(C); *see* A.R.S. § 9-500.11(M)(2) (defining "expenditure" as a rebate and other abatement). Like A.R.S. § 9-500.05(G), § 9-500.11(C) references A.R.S. § 19-142(B) and similarly provides a basis for referring a city's decision involving an expenditure. *See* A.R.S. § 9-500.11(C).

¶43            As noted above, the Development Agreement also requires a CDP and a PAD approved by the City. *Supra* ¶ 2. The CDP and the PAD determine "the specific uses, densities, features, and other development matters applicable to the Property." The Development Agreement further authorizes the City's "Director of Community Development to consent to any additional request of the Developer for sign approval that meet the intent of the Project and deviate from the Tempe Zoning Code."

### 3.    Policy Creation v. Policy Implementation

¶44        We similarly reject the City's argument that its ZDC's mixed-use-four ("MU-4") zoning designation is the previously declared legislative policy.  While there is overlap between the zoning designation and the Development Agreement, the latter details extensive tax, expenditure, sale, and development decisions beyond what is provided in the zoning designation.  *Supra* ¶¶ 40-43; *see Wennerstrom*, 169 Ariz. at 489 (noting an act is not legislative if it "merely carries out the policy or purpose already declared by the legislative body").  The City asserts that an appraisal of prior relevant governmental action is crucial in determining whether the Ordinance merely administers prior legislation or constitutes legislation itself.  To this end, the City argues that its ZDC's MU-4 zoning designation is the previously declared legislative policy and the Ordinance is the administrative act carrying out that policy.  *See Wennerstrom*, 169 Ariz. at 489 (noting an act is legislative "if it prescribes a new policy or plan" but is administrative "if it merely pursues a plan already adopted" (quoting 5 McQuillin, *supra*, § 16:53)).

¶45        The ZDC's MU-4 zoning designation contemplates future legislative acts, and the City cites no authority that would prevent the City Council from enacting such legislation.  *See Fritz*, 191 Ariz. at 434, ¶ 16 (noting that the city's general plan "clearly contemplated that future decisions such as imposing specific uses on specific locations would merely adhere to the Plan because the Plan itself does not descend to or mandate such specificity").  Because the MU-4 zoning designation allows for "a range of *development* intensities" and the Development Agreement creates the specific policy for the permanent disposition of the property through GPLET leases, increased tax revenues for the City, cash contributions for the public welfare, and job creation, we cannot agree that the ZDC's MU-4 zoning designation is the previously declared legislative policy.  *See* ZDC § 3-201(B)(6); *Fritz*, 191 Ariz. at 434, ¶ 11 (requiring legislative acts to be definite and specific).  Consequently, executing the Development Agreement through the Ordinance is a matter of policy creation.  *See Wennerstrom*, 169 Ariz. at 489 (noting policy creation is legislative and policy implementation is administrative).

¶46        The Ordinance neither identifies the previously declared policy decision it intends to implement nor suggests that the MU-4 zoning designation is the policy it intends to carry out.  *See, e.g.*, *id.* at 490 (noting the bond election was the previously declared legislative decision and the resolutions improving the city's streets and highways were the administrative acts).  Rather, the City Council provides in the Development

Agreement that, by its approval, the execution of each GPLET lease "is an administrative action in furtherance of *this* policy," that is, the Ordinance and Development Agreement. (Emphasis added.)

**¶47** Though the ZDC's MU-4 zoning designation informs residents of the land uses within the property, it does nothing to inform them of future policies within the Development Agreement. *See* ZDC §§ 2-103, 3-202. For example, the Development Agreement includes (1) Developer's tax incentives, leases, agreements, and cash contributions; (2) the property's phased sale, disposition, and zoning deviations; and (3) other requirements related to the CDP and PAD—none of which were included in the MU-4 designation. *See* ZDC §§ 2-103, 3-201(B)(6). Further, though the MU-4 designation also requires a PAD overlay, the PAD in the Development Agreement is intended to be specific to the property. *See* ZDC § 5-401 ("The PAD *overlay district* may be tailored to meet the specific development representations of an application. Hence one (1) PAD overlay may vary considerably from another overlay."). Thus, the Development Agreement both informs residents of its policies and contemplates future legislation.

**¶48** Accordingly, we determine that together the Ordinance and Development Agreement are legislative, and thus, referable.

## CONCLUSION

**¶49** For the foregoing reasons, we affirm the superior court's ruling in part as it correctly determined that the Ordinance was referable. We reverse in part because the referendum petition used by Workers strictly complied with all the statutorily required information.



AMY M. WOOD • Clerk of the Court
FILED: AA

15